LAMBERT, Plaintiff in error, v. STATE, Defendant in error.

*No. 75–210–CR. Argued June 1, 1976.—Decided July 12, 1976.*
(Also reported in 243 N. W. 2d 524.)

For the plaintiff in error there were briefs and oral argument by *Howard B. Eisenberg,* state public defender.

For the defendant in error the cause was argued by *Thomas J. Balistreri,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

DAY, J. On December 21, 1974, three judgments of conviction were entered against defendant James Charles Lambert arising from three criminal actions charging a total of six counts of theft by fraud contrary to sec. 943.20 (1) (d), (3) (b), and (3) (c), Stats.[1] These actions had been consolidated for trial. Mr. Lambert was sentenced to one indeterminate term of not more than four years consecutive to a two-year sentence he was then serving for a similar offense, four terms of not more than five years each, consecutive to the first and to each other, and one consecutive five-year

---

[1] "943.20 **Theft.** (1) ACTS. Whoever does any of the following may be penalized as provided in sub. (3):

"...

"(d) Obtains title to property of another by intentionally deceiving him with a false representation which is known to be false, made with intent to defraud, and which does defraud the person to whom it is made. 'False representation' includes a promise made with intent not to perform it if it is a part of a false and fraudulent scheme.

"(3) PENALTIES. Penalties for violation of this section shall be as follows:

"...

"(b) If the value of the property exceeds $100 but not $2,500, a fine of not more than $5,000 or imprisonment for not more than 5 years or both.

"(c) If the value of the property exceeds $2,500, a fine of not more than $10,000 or imprisonment for not more than 15 years or both."

term to be stayed during a ten-year period of probation consecutive to his release from prison. The issues raised on this appeal are as follows: (1) whether this action was barred by ch. 248 (abolishing actions for breach of promise to marry); (2) whether one of the informations was insufficient to confer subject-matter jurisdiction on the trial court; (3) whether these offenses were properly joined for trial; (4) whether the trial court abused its discretion in restricting cross-examination of complaining witnesses; (5) whether the trial court erred in instructing the jury concerning the elements of fraud; (6) whether the evidence was sufficient to support the verdict of guilty; and (7) whether the trial court abused its discretion in imposing consecutive sentences totaling 24 years, followed by ten years of probation.

Each of the six counts of theft by fraud arises from a relationship between Lambert and a different woman, during which he obtained varying amounts of money from each on the basis of promises to marry her. The first three women were courted serially between August 1971, and December 1973; the other three were courted during the first half of 1974. The state's case consisted of the testimony of the six complaining women, and one additional woman who claimed to have been similarly defrauded by the defendant in Illinois during April and May of 1974. The defendant was his own sole witness.

Ms. R., a single, 20-year-old hair stylist, met Lambert (then using the alias "Danny Paladino") in a Milwaukee restaurant on an evening in August 1971, and invited him to her apartment. He talked of his life; and Ms. R. testified that she forthwith fell in love with him. Lambert expressed a reciprocal sentiment and later that very evening in his car he proposed marriage, stating that he owned a nightclub in Denver and would show her "a better life." Ms. R. accepted, but moved to

defer the wedding until April 1972. Lambert did not tell her he was already married. In September 1971, Ms. R. gave him $475 because, she testified, "I loved him and wanted to marry him," and he needed the money for a gambling debt. That same month, however, Ms. R. found out through investigation of his license plate number where Lambert lived and, upon going there, discovered him with a woman who explained that she was not married or romantically involved with Lambert. In fact, this woman was Jill Lambert, who had been married to the defendant since 1969 and remained married to him at least until this trial, a fact stipulated by the defense. Lambert gave Ms. R. a promissory note on September 27, 1971, for $475. She requested return of her money, and ultimately got about $80 back, she said. Lambert testified that Ms. R. had lent him $475, but that he had paid back "close to $300" by August 1972. He characterized his relationship with her as "truly physical," and stated that he had never offered to marry her.

Ms. M. S., a keypunch operator separated from her husband, met Lambert in October 1972, when he came to her home under the alias "Michael Pauldino," posing as a private investigator from Denver inquiring about her estranged husband. Their relationship progressed to the point where he proposed marriage in November 1972. Ms. M. S. accepted, she said, unaware of Lambert's true identity and the fact that he was already married, although on cross-examination she admitted that she hadn't been sure what his real name was. Nevertheless, on two or three occasions Ms. M. S. gave Lambert a total of about $400 "because he said we needed as much as we could get to get married." In January and February 1973, she borrowed $800 from two finance companies and turned the money over to Lambert. In February 1973, she moved out of her parents' home and

into an apartment with Lambert; they used the names "Mr. and Mrs. Michael Pauldino." Ms. M. S. sold furniture she owned for $475, and gave it to Lambert for gambling purposes. By March 1973, she had become suspicious. Lambert admitted his true identity, and that he was married and had two children, but told her that she "shouldn't worry about it," since "his uncle's lawyers" could annul her own marriage in San Francisco. She believed him, she testified, because "He made it sound so easy." She subsequently turned over to him a $390 income tax refund and her wedding rings because "he said we needed the money to get to California on so we could be married." On cross-examination, the defense attempted to question Ms. M. S. concerning the fact that in a bankruptcy petition filed on April 9, 1973, Ms. M. S. had not listed as assets any monies owed to her by Lambert. The trial court excluded such evidence as irrelevant. Lambert testified that he had never lived with Ms. M. S. and denied promising to marry her or to take her to California, and having received any money or jewelry from her.

Ms. D. S., a 27-year-old single clerical worker, met Lambert in late April 1973, through a co-worker. After one evening date and telephone contacts, Lambert took her to a motel three days later, presented her with an engagement ring, and proposed marriage. Ms. D. S. said she would think it over. That very evening, Lambert discussed a used car venture which required an investment of $2800; the next day Ms. D. S. gave him that amount in exchange for equivalent promissory notes due in May and June of that year, relying in large part, she testified, on his marriage proposal. In October 1973, while Ms. D. S. was still considering the marriage proposal, Lambert asked for and was given another $1000 loan on the representation, never fulfilled, that they would go to Denver together to straighten out certain

assets of his located there. On December 27, 1973, after continual urgings by Lambert, Ms. D. S. consented to marry him and shortly gave Lambert an additional $2600 to "buy furniture and for marriage plans." Lambert thereafter disappeared from Ms. D. S.'s life except for several phone contacts (including a successful request for another $125). On cross-examination, Ms. D. S. was asked if she had ever told her parents with whom she lived, of her marriage plans or of the money loaned to Lambert; the trial court excluded such evidence as irrelevant. Lambert testified that he had never asked Ms. D. S. to marry him. He admitted accepting the loans referred to by Ms. D. S., but testified that they were intended for business-related purposes, and not for marriage expenses. He also said that he always intended to pay Ms. D. S. back.

Ms. V., a 20-year-old single legal secretary, met Lambert (then operating as "James LaPorte") through a friend on December 19, 1973. He took her out the following evening, and again the next day, and then again on New Year's Eve, when he proposed marriage. Ms. V. testified that she was in love with him, but felt she should consult her family. On January 19, 1974, Lambert reiterated his proposal, and offered a ring in support of it; Ms. V. accepted. The subject of money came up shortly, and Ms. V. gave Lambert $450 "because he was my fiancee." On April 16, Lambert requested and received $2000 for the expressed purpose of satisfying tax obligations. The marriage was set for June 7, 1974, and all preparations were made; a newspaper announcement and wedding invitation were introduced into evidence. On June 2 or 3, Ms. V. testified, Lambert called and said that he "just couldn't do it at this time," and the wedding was cancelled. On cross-examination, the defense attempted to introduce testimony on the value of diamond rings and earrings

that Lambert had given Ms. V. for Christmas, which the trial court excluded. Lambert admitted having courted Ms. V. under the name of LaPorte, and having proposed marriage, a promise which, he testified, he intended to follow through on until Ms. V's parents, not he, cancelled the wedding.

Ms. J. R., a 27-year-old woman then in the process of being divorced, met Lambert at the dealership where he was selling used cars in January 1974. He proposed marriage on January 14, during their first meeting after being introduced. Since she was not yet divorced, Ms. J. R. could not actually accept, but they discussed moving to Denver with her children. On January 16, Ms. J. R. gave Lambert $500 to "straighten out some things" because, she testified, "we had planned on getting married." On January 23, February 14, and May 8, she gave him additional amounts totaling $886 for similar reasons. She testified that she "loved him and planned on being married to him," although her divorce did not become final until May 1974. Lambert denied having offered to marry Ms. J. R., or having taken any money from her.

Ms. E., a 29-year-old woman also in the process of being divorced,[2] met Lambert (again under the name LaPorte) in a Milwaukee bar on March 22, 1974. They spent the evening together and, after one intervening visit to her home, the question of marriage came up about April 3, when Lambert proposed over the phone. Ms. E. accepted because "[she] loved him," contingent upon the finalization of her divorce. On April 5, Lambert took $700 from her, she testified, ostensibly for his use in connection with the purchase of a nightclub in Phoenix. Lambert told her that he already owned a

---

[2] Her divorce would become final on September 30, 1974, she said, although in about the middle of April her husband filed "an adultery suit" based on her relations with Lambert.

club in Denver, and that the Phoenix liquor license would be in her name. Ms. E. testified that she gave him the money only because they were engaged, and that smaller amounts aggregating $650 were later given to Lambert "for our future that he had planned for us in Phoenix after we were married." She also sold her home in reliance on the expected marriage, she said. Lambert denied that he had ever promised to marry Ms. E., or that he had received any money from her. He characterized their relationship as a joint business venture for the purchase of a Phoenix nightclub, on which she had reneged.

Ms. M. was not a complaining witness. A 30-year-old widow living in Chicago, she met Lambert at a Milwaukee restaurant on April 27, 1974. Two days later he visited her at home in Chicago, and the following day he proposed marriage, stating that he was moving to Phoenix and would take her with him. She accepted, and loaned him $1700 to help finance a Phoenix "business deal." Two weeks later she gave him another $275. A May 25 wedding date was set which, she said, Lambert did not keep. Lambert denied having proposed to Ms. M. or having taken money from her; "it was a physical relationship, that's all."

At the close of the evidence, the jury was instructed on the elements of theft by fraud consistent with Wis J I—Criminal 1453: a knowingly false representation made with the intent and effect of deceiving and defrauding. At the request of the state and without any defense objection, the court also gave an instruction not included in the standard jury instructions: "It is not a necessary condition to conviction of theft by fraud that there must be proof that the defrauded party had made an investigation as to the truth of the representations relied on."

On the evidence and instructions the jury found Lambert guilty on all counts, and he was sentenced under circumstances described in detail below.

*Effect of chapter 248, Stats.*

■ By secs. 248.01, 248.02, Stats.,[3] the legislature has abolished "[a]ll causes of action for breach of contract to marry." The defense argues that this prosecution, since it is based on Lambert's promises to marry, is barred by the statute. The defense position is that it is now legally impossible to commit fraud by use of promises to marry. This position is refuted simply by reference to sec. 248.06,[4] which permits civil suits for recovery of property taken on the strength of a fraudulent promise to marry. In abolishing the action for breach of contract to marry, it is apparent that the legislature intended

---

[3] "248.01 **Actions for breach of promise, alienation of affection and criminal conversation abolished.** All causes of action for breach of contract to marry, alienation of affections and criminal conversation are hereby abolished, except that this section shall not apply to contracts now existing or to causes of action which heretofore accrued."

"248.02 **Purpose.** No act hereafter done within this state shall operate to give rise, either within or without this state, to any of the causes of action abolished by this chapter. No contract to marry, which shall hereafter be made in this state, shall operate to give rise, either within or without this state, to any cause of action for breach thereof, and any such acts and contracts are hereby rendered ineffective to support or give rise to any such causes of action, within or without this state."

[4] "248.06 **Actions for recovery of property procured by fraud; corroboration required.** Actions for the recovery of property received by one party from the other after the alleged contract to marry and before the breach thereof, which was procured by such party by his or her fraud in representing to the other that he or she intended to marry the other and not to breach the contract to marry, are not barred by this chapter; but such actions must be commenced within one year after the breach of the contract to marry and the cause must be shown by affirmative proof aside from the testimony of the party seeking the recovery."

to abolish only the common-law suit for damages based on the emotional harm caused by the breach. There was no intent to sanction either civil or criminal fraud by the breaching party against the property of a duped victim.

The defense argues alternatively that this prosecution is subject to the restrictions placed on civil actions for fraud by sec. 248.06, Stats., *supra*, setting a one-year statute of limitations and requiring "affirmative proof" aside from the complainant's testimony to establish the cause of action. Even if these restrictions were applicable, there is no lack of corroborating evidence for each count in the testimony of the other defrauded women. As for the statute of limitations, sec. 248.06, does not manifest any intent to amend the applicable statute of limitations (sec. 939.74) for criminal fraud prosecutions. To hold that the limit of sec. 248.06 applies here would be to hold that whenever the legislature changes the conditions or restrictions on a civil action, it means to do the same to related criminal actions. We disagree.

*Defects in pleadings.*

The defense argues that the pleadings in one of the present cases[5] failed to allege the elements of any crime known to the law, and that the trial court lacked subject-matter jurisdiction over the case. The complaint and information allege that Lambert:

". . . on 4–27–73 at 4369 South Howell Avenue and on 10–30–73 at 5542 North 53rd Street, and on 12–27–73 at 4369 South Howell Avenue, all in the City of Milwaukee, did intentionally and feloniously steal the property of [Ms. D. S.], having a value of more than $2500, to-wit: $6200 in U. S. Currency, contrary to Wisconsin statutes sections 943.20 (1) (d) & (c)."

---

[5] This case covers only the count involving Ms. D. S., for which Lambert received ten years' probation.

The reference to the statute should read "943.20 (1) (d) & *(3)* (c)," and did appear in this form at the top of both the complaint and information. Section 943.20 (1) (d) is the important one, enumerating the elements of the crime.

Since the briefs were filed, this court has decided *Schleiss v. State* (1976), 71 Wis. 2d 733, 239 N. W. 2d 68, which almost completely disposes of the defense position in the present case. In *Schleiss*, the textual description of the offense in the information was deficient but the statute allegedly violated was accurately cited. The court held at page 738:

". . . the failure to specifically allege a material element of the crime within the factual statement contained in the information does not *ipso facto* render the information void, if the statute which contains the substantive elements of the offense is cited therein. The statutory cite is incorporated, the defendant is adequately apprised of the nature and substance of the charge, and thus is not prejudiced by the omission from the factual statement of a substantive element of the alleged violation."

The similar cases of *Clark v. State* (1974), 62 Wis. 2d 194, 199, 200, 214 N. W. 2d 450; *State v. Nowakowski* (1975), 67 Wis. 2d 545, 227 N. W. 2d 697; and *State v. Bachmeyer* (1945), 247 Wis. 294, 19 N. W. 2d 261, were cited and relied upon, with the observation that in all of these as well as in *Schleiss* there was no evidence that the defense had been prejudiced in any way by the failure of the information to set forth every element of the crime. *See:* sec. 971.26, Stats. In the present case, there was never any question as to how Lambert's alleged theft had been perpetrated. The defense does not even attempt to argue that the failure of the information to reiterate the wording of sec. 943.20 (1) (d) impeded its preparation.

The *Schleiss Case* also distinguishes *Champlain v. State,* on which the defense relies, where a defective pleading was held fatal to the prosecution:

"The defendant relies, in part, on *Champlain v. State* (1972), 53 Wis. 2d 751, 193 N. W. 2d 868, wherein it was determined the trial court was without jurisdiction because of a fatally defective complaint. In *Champlain* the defendant was charged with armed robbery contrary to sec. 943.32 (2), Stats. Sec. 943.32 (2) increases the maximum penalty for robbery, as defined by sec. 943.32 (1) from 10 years to 30 years when the act is committed while the defendant is armed with a dangerous weapon. The problem was presented in *Champlain* because sec. 943.32 (1) defines two separate and distinct crimes of robbery, one in subsection (a) and a second in subsection (b). The information did not allege which of the two possible crimes of robbery the defendant was alleged to have committed while armed with a dangerous weapon. Such is not the situation in the instant case."

Other cases cited by the defense involve obscenity prosecutions, a peculiar situation where the First Amendment overlay creates a standard of pleading not generally applicable, as was stated in *Clark, supra,* 62 Wis. 2d at page 203:

"The defendant's reliance on *State v. Schneider* (1973), 60 Wis. 2d 563, 211 N. W. 2d 630, and *State v. Green* (1973), 60 Wis. 2d 570, 211 N. W. 2d 634, is also misplaced. *Schneider* and *Green* have no significance whatever when considering the issue here raised by the defendant. *Schneider* and *Green* and *Smith v. California* (1959), 361 U. S. 147, 80 Sup. Ct. 215, 4 L. Ed. 2d 205, rehearing denied, 361 U. S. 950, 80 Sup. Ct. 399, 4 L. Ed. 2d 383 (cited in *Schneider*), go directly and only to the question of whether scienter is a constitutionally required element in a criminal obscenity statute because it is intimately related to the constitutional scope (first amendment) of the power to bar material as obscene."

*See also: State v. Reichert* (1975), 67 Wis. 2d 69, 73, 226 N. W. 2d 196. We hold that the pleadings in the present case were adequate to confer jurisdiction.

*Joinder of several offenses.*

The state and the defense are in complete agreement that the propriety of joining these offenses for trial depends upon whether evidence of the other offenses would be admissible at the separate trial of each.[6] This presents a *"Whitty* question" concerning admissibility of evidence of other crimes, which is admissible for limited purposes, including proof of motive, intent, and preparation or plan.[7]

■ In the present case there can be no question that evidence of Lambert's other activities would have been admissible in the separate trial of each offense to show the contested elements of his fraudulent purpose in establishing these relationships, and his consistent plan for accomplishing these frauds. Indeed, such evidence is the heart of the case; it was palpably fraudulent for him to be negotiating similar arrangements simultaneously with Ms. D. S., Ms. V., Ms. J. R., Ms. E., and Ms. M. Evidence of his prior liaisons with Ms. R. and Ms. M. S. was also admissible to show Lambert's fraudulent intent in dealing with all of these women.

*Restriction of cross-examination.*

The defense argues that the trial court erred in restricting the cross-examination of (1) Ms. M. S. concerning her bankruptcy petition, (2) Ms. D. S. concerning whether she had told her parents of her alleged wedding plans, and (3) Ms. V. concerning the value of gifts given to her by Lambert.

■ Ms. M. S.'s failure to list as assets on a bankruptcy petition the monies she had turned over to Lambert

---

[6] *Bailey v. State* (1974), 65 Wis. 2d 331, 345–348, 222 N. W. 2d 871; *Peters v. State* (1975), 70 Wis. 2d 22, 29, 233 N. W. 2d 420.

[7] *Whitty v. State* (1967), 34 Wis. 2d 278, 291, 298, 149 N. W. 2d 557; *Bailey, supra,* footnote 6.

is subject to two interpretations: First, that the money was given rather than loaned; second, that there was never any money given or loaned by her to Lambert. If there were evidence that Ms. M. S. regarded the funds turned over to Lambert as a series of loans, evidence of her bankruptcy petition woud have been relevant to the existence of the loans and to Ms. M. S.'s credibility, and therefore admissible. However, Ms. M. S. never testified that she lent the money to Lambert, nor were there any written notes of obligation exchanged here as in some of the other cases. She consistently testified that she gave the funds (and her wedding rings) to him because he had said it was necessary in connection with their marriage. Since there was no evidence that the funds advanced were loans, evidence of whether or not these funds were identified as loans on Ms. M. S.'s bankruptcy petition was irrelevant to the issue of whether she had given Lambert money, as she testified, and was properly excluded. Sec. 904.01, Stats.

■ Ms. D. S.'s precluded testimony, concerning communication with her parents about her affair with Lambert, did not require an offer of proof. Under sec. 901.03 (1) (b), Stats.,[8] where the expected testimony is apparent from the context, no offer of proof is necessary. Here it is apparent that defense counsel expected Ms. D. S. to testify that she had not told her parents, with whom she was living, of her engagement to Lambert. The state concedes that failure of a witness to assert a

---

[8] "901.03 **Rulings on evidence.** (1) EFFECT OF ERRONEOUS RULING. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected; and

". . .

"(b) *Offer of proof.* In case the ruling is one excluding evidence, the substance of the evidence was made known to the judge by offer or was apparent from the context within which questions were asked."

fact when it would have been natural to do so amounts to an assertion of the nonexistence of the fact. 3A Wigmore, *Evidence* (Chadbourn rev. 1970), p. 1056, sec. 1042; *cf. Caccitolo v. State* (1975), 69 Wis. 2d 102, 110, 230 N. W. 2d 139. Evidence of what Ms. D. S. had told her parents was certainly relevant to establishing the depth of her belief in Lambert's alleged proposals of marriage, and thus to whether she was in fact defrauded. This evidence was erroneously excluded. However, this error alone was not prejudicial, since the extraordinarily large sums Ms. D. S. gave Lambert ($6200 total) are explainable only if she believed she was going to marry Lambert. It does not appear that admission of the excluded testimony would have been at all likely to change the result.

With respect to Ms. V., the defense made no offer of proof concerning the value of the diamond earrings, or even that Ms. V. knew their value. "An offer of proof is a condition precedent to having this court review an allegedly erroneous ruling or evidence. . . ." *State v. Hoffman* (1973), 58 Wis. 2d 21, 24, 205 N. W. 2d 386; sec. 901.03 (1) (b), Stats. Even if the offer of proof had been made and the exclusion of this evidence is assumed to have been error, there can have been no prejudice, since the fact that Lambert had given Ms. V. "diamond earrings" was clearly stated to the jury. Only their value was withheld. Indeed, it is just as likely (in the absence of any offer of proof) that the jury may have overestimated as underestimated their value. When the defendant testified he did not offer any testimony as to their value.

*Jury instructions.*

■ The defense argues that the extra instruction concerning the defrauded party's lack of duty to investigate the fraudulent representations was erroneous.

Although the defense failed to object to this instruction before verdict, it is the established rule of this court that objection to instructions is not waived where the instruction misstates the law (rather than being simply incomplete or imperfect) :

"The attorneys for Koehring correctly point out that no objection was made to the instruction prior to submission to the jury. Under the usual rules of appellate procedure, an objection to incomplete or imperfect instructions comes too late when asserted for the first time after the jury's verdict has been returned. We have, however, consistently held that, when an instruction misstates the law, error can be asserted for the first time after the verdict is returned and on motions for a new trial. *Johnson v. Heintz* (1973), 61 Wis. 2d 585, 593, 213 N. W. 2d 85; *Menge v. State Farm Mut. Automobile Ins. Co.* (1969), 41 Wis. 2d 578, 585, 164 N. W. 2d 495." *Lemberger v. Koehring Co.* (1974), 63 Wis. 2d 210, 224, 225, 216 N. W. 2d 542.[9]

On the merits, the defense relies on *Koehler v. Haechler* (1965), 27 Wis. 2d 275, 278, 133 N. W. 2d 730, for the proposition that Lambert's victims had sufficient information about him to be placed under some duty of inquiry, and charged with the knowledge that such inquiry would have produced. The state correctly distinguishes *Koehler* on the fact that it specifically concerned the commencement of the statute of limitations period at the point when the defrauded party should become suspicious and take reasonable steps to uncover the fraud. In this light, the *Koehler Case* and similar authorities quoted there do not place any burden of inquiry on the defrauded parties before the fraud occurs.

---

[9] *See also: Heldt v. Nicholson Mfg. Co.* (1976), 72 Wis. 2d 110, 114, 240 N. W. 2d 154; *Nimmer v. Purtell* (1975), 69 Wis. 2d 21, 37, 230 N. W. 2d 258 (nonwaiver rule applied); *Savina v. Wisconsin Gas Co.* (1967), 36 Wis. 2d 694, 702, 154 N. W. 2d 237; for a related doctrine, *see: Claybrooks v. State* (1971), 50 Wis. 2d 79, 84, 183 N. W. 2d 139.

In civil fraud, a plaintiff is barred from recovery if he has failed to exercise ordinary care in discovering obviously fraudulent representations of the defendant. *Williams v. Rank & Son Buick, Inc.* (1969), 44 Wis. 2d 239, 245, 246, 170 N. W. 2d 807. In a criminal fraud prosecution, however, the negligence of the victim is not relevant to the defendant's guilt, although it is, of course, a necessary element of the crime that the false representation does, in fact, deceive the victim. *Palotta v. State* (1924), 184 Wis. 290, 294, 199 N. W. 72. Contributory negligence is not a defense to a criminal prosecution, as provided in sec. 939.14, Stats.:

"939.14 **Criminal conduct or contributory negligence of victim no defense.** It is no defense to a prosecution for a crime that the victim also was guilty of a crime or was contributorily negligent."

The instruction given in this case—that the victim is not required to investigate the defendant's representations—is not an erroneous statement of the law. The defendant would have us regard love, trust, and generosity not as admirable traits of character, but as weaknesses to be sneered at, leaving those who possess them as fair game for the con artist. We decline to do so.

*Sufficiency of evidence.*

The defense makes two challenges to the sufficiency of the evidence: (1) that the three women who were legally married at the time of Lambert's proposals to them could not legally accept his proposals, and therefore were not defrauded; (2) that the evidence failed to show various elements of the alleged crimes.

The first defense contention is that Lambert's promises to marry Ms. M. S., Ms. J. R., and Ms. E. could not have been fraudulent (even if he intended them to be so) because their existing marriages should have

prevented them from relying on his proposals, and would have been a bar to a former suit for breach of promise to marry. However, the question in an action for criminal fraud is not whether the victim could legally rely on the fraudulent promises, but rather whether he did reasonably rely on them in surrendering his property or funds. In each case Lambert knew the woman involved was married and yet persisted in his entreaties. His representation was not as to future expectations or probabilities for which fraud would not lie, but rather as to his current devotion and intention to marry each of them when circumstances would permit. If Lambert had no intention to perform at the time he made the proposal, fraud was present *in praesenti*. *Hartwig v. Bitter* (1966), 29 Wis. 2d 653, 658, 139 N. W. 2d 644.

The defense attacks the sufficiency of the evidence in numerous respects, arguing in general with the jury's interpretation of the evidence in concluding that the women did rely on Lambert's marriage proposals in "loaning" him money. The jury's conclusion that they did so rely is fully supported by the testimony and, indeed, is the only conclusion consistent with the evidence taken as a whole. The only issue here is one of witness credibility, which is for the jury.

*Sentencing.*

Lambert was sentenced to 24 consecutive years of imprisonment on five counts, and an additional ten years of probation on the sixth count (concerning Ms. D. S.). The statutory maximum would have been five years each on the five counts punishable under sec. 943.20 (3) (b), Stats., and fifteen years on the count relating to Ms. D. S. under sec. 943.20 (3) (d), *supra*. In addition, on three of the counts Lambert was charged under the repeater statute, sec. 939.62 (1) (b), which added an additional 18 years to the permissible sentence.

The trial judge made very clear his reasons for the lengthy sentence imposed here. Lambert had previously been convicted of an offense virtually identical to those involved here; at that time two other such frauds were read into the record. He was sentenced to two years' imprisonment, but placed on probation with a restitution condition that was not observed. In 1965 and, apparently, 1955, he was adjudged a father in paternity proceedings, and another such proceeding was pending at the time of this trial. There were unspecified difficulties with support payments. In addition to this record, the trial court found that the defendant was an "outrageous liar" in stating during the sentencing proceeding that he always intended to pay the money back. As the trial judge stated at the hearing on motions after verdict: "I don't believe there is any hope for rehabilitation for this man. I believe he has to be separated from this society, like you would separate a person contaminated with a dangerous disease. . . ."

In justifying the length of the sentence, the trial court specifically cited the case of *Lange v. State* (1972), 54 Wis. 2d 569, 577, 196 N. W. 2d 680, where this court sustained sentences running a consecutive length of 16 years for two burglaries and several drug-possession crimes, explaining that habitual offenders are not limited to the five-year sentence limit for ordinary felons suggested by *McCleary v. State* (1971), 49 Wis. 2d 263, 182 N. W. 2d 512.

This court has recognized the propriety of lengthy sentences where the trial judge finds that rehabilitation is unlikely, and there is a simple need to protect society from the individual. *Bastian v. State* (1972), 54 Wis. 2d 240, 246, 194 N. W. 2d 687. While the present crime does not, like *Bastian,* involve a crime of physical violence, it does involve a callous disregard of others' emotional sensitivity. The trial judge could

not find, nor does the record show, any remorse on Lambert's part.

It is not disputed that the trial judge fully articulated the reasons underlying his exercise of discretion in sentencing, as required under *McCleary v. State, supra.* The defense here argues that this is an extraordinary case in which the facts articulated by the trial judge simply do not support a sentence of this length. However, this court has held that the facts need only show a "rational basis" for the sentence imposed. *Gaddis v. State* (1974), 63 Wis. 2d 120, 129, 130, 216 N. W. 2d 527. In the present case, the facts of Lambert's chronic offenses provide a rational basis for the sentence. We find no abuse of discretion.

The defense makes several other attacks on the sentencing procedure which we conclude have no merit.

*By the Court.*—Judgment affirmed.