SMITH, Plaintiff in error, v. STATE, Defendant in error.

*No. State 42. Argued May 5, 1975.—Decided June 30, 1975.*
(Also reported in 230 N. W. 2d 858.)

For the plaintiff in error there was a brief and oral argument by *Howard B. Eisenberg,* state public defender.

For the defendant in error the cause was argued by *William L. Gansner,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

DAY, J. The question raised is, was there sufficient evidence adduced at trial to prove the defendant guilty of first-degree murder beyond a reasonable doubt? We conclude there was.

The plaintiff in error, Joseph Gerard Smith (hereinafter "defendant"), was found guilty of first-degree murder following a jury trial and was sentenced to life imprisonment as required by sec. 940.01, Stats. A writ of error was taken to review the judgment of conviction and the only ground alleged to require a reversal of the judgment and the granting of a new trial is the insufficiency of the evidence to support the jury finding of the necessary intent to kill.

This action was commenced by the issuance of a criminal complaint on October 19, 1973, charging the defendant with the murder of Alvin Baumann at the Baumann home in the town of Plymouth, Sheboygan county, on October 10, 1973. The trial was held in January of 1974.

The defendant was aged sixteen years at the time of his arrest and lived in a group home for boys. On October 8, 1973, the defendant met two friends and arranged with one of them to leave and go to Florida; however, the friend changed his mind and he then asked the other friend to drive him out to the country to a cabin which was owned by the father of an acquaintance. After obtaining some food, the defendant was driven out to the cabin and on the way asked one of the friends if he could sneak a pistol or shotgun from his house for the defendant to use to hunt game around the cabin, but this was not done. The defendant was left alone at the cabin and remained until mid-morning of October 10, 1973. At that time, while sitting on the porch, a car drove up and the occupants engaged him in conversation, saying they knew the owner of the cabin. When they left, the defendant decided to leave the cabin and walk to his grandmother's house. He walked through the woods along an abandoned railroad track bed until he came upon Camp Evelyn, a Girl Scout camp where Mr. Baumann lived in a house with his wife and worked as caretaker. The

defendant looked around the premises; saw Mr. Baumann and asked him for a drink. Mr. Baumann explained that the plumbing in the house was not working and then went into the house and got a cup and gave it to the defendant to use in getting a drink from an outdoor spigot.

The defendant walked away from the camp and noticed a jeep parked on the premises. He waited in a stand of pine trees for one to two hours, trying to decide whether to continue walking or return to the camp and steal the jeep. He decided to steal the jeep, food and money. When he looked into the jeep he noticed the keys in the ignition and a double-barrel shotgun in the vehicle. He took the shotgun out of the jeep, opened the breach and found a shell in each barrel. He then went into the Baumann home, intending to steal food and money. Mr. Baumann was sitting in a chair in front of the television. The defendant told Mr. Baumann he was taking the jeep and, as he testified, "could have" asked for money. Mr. Baumann told him to take the jeep. The defendant said he was holding the shotgun at waist level and said he was not pointing it at Mr. Baumann; then, according to the defendant, Mr. Baumann:

". . . started to make a movement like he was getting up out of the chair and then I was jumpy at the time and then I backed into the TV set and that is when the gun went off and I shot him."

The defendant described how he came to pull the second trigger and testified:

"Well, he was standing at the time, you know, and he swung around and then I pulled the second trigger and I shot him in the back."

Defendant testified that he was aware that he pulled the trigger the second time but said he did not know if he intended to pull it. After firing the second shot, defendant took Mr. Baumann's wallet out of his rear pants

pocket, removed the money and threw the wallet on the sofa, turned off the television set, and left in the jeep. The defendant testified that he did not move the body.

The defendant drove the jeep into Sheboygan where he saw a friend in a high school parking lot. The friend testified that he noticed a double-barrel shotgun in a very thin case between the two seats in the jeep and was told by the defendant that the defendant had found the vehicle with the gun in it. This witness also testified that the defendant seemed quite nervous, was looking around a lot and was nervously rubbing the stick shift of the vehicle. Defendant then drove the jeep south, through Milwaukee and Chicago, to Indiana, where he ran out of gas and abandoned the jeep on the roadside. Defendant was arrested for hitchhiking and was taken to the La Porte, Indiana, county jail. He told the police that he was a runaway from the boys home in Sheboygan and said that a truck had dropped him off where the police found him. The police called the home in Sheboygan and the Sheboygan police and sheriff's departments who informed the Indiana police that the defendant was in fact a runaway and a possible suspect in a homicide. After being advised of his constitutional rights, the defendant informed the Indiana authorities that he stole the car but he had not shot anyone.

At approximately 6:30 a.m. on October 11, 1973, the jeep was found abandoned on the shoulder of a highway about two miles from where the defendant had been arrested and a double-barrel shotgun was found in it. By the afternoon of October 11th the Sheboygan police had arrived in La Porte; the defendant was again advised of his constitutional rights. In an interview with the Sheboygan authorities he insisted he had found the jeep and had no knowledge of the shooting death of Mr. Baumann. He stayed with that story for about three hours; then the officer left briefly and when he returned he told the

defendant he thought he was lying and the defendant then said, "I shot the guy." Then he proceeded to give the officer the account of the events surrounding the shooting, as outlined above. This was also the testimony of the defendant at trial. In addition, he told the officer that when he confronted Mr. Baumann there were no heated words, no argument, "no swearing or cussing." He also told the officer regarding the second shot that he "went nuts and put a second shell" into Mr. Baumann; he said the second shot struck Mr. Baumann in the back and that Mr. Baumann ended up by laying on his stomach on the floor.

The body was discovered by Mrs. Baumann later that afternoon. The empty wallet was on the sofa. The pathologist from the Wisconsin state crime laboratory, who performed the autopsy on Mr. Baumann's body, testified at the trial that Mr. Baumann was shot twice, once through the back chest area above the rib cage and below the level of the shoulders and once through the front chest area. He recovered approximately 47 lead pellets from the body and testified that Mr. Baumann was shot first in the back, then in the front and that it was the second shot that killed him instantly. He said the shot to the back chest area entered the body at a horizontal or straight angle, while the shot to the front angled slightly downward. He said it was his opinion that the distance from the muzzle of the gun to the body was three to nine feet. He also believed the body had been moved after the shooting; that it had been on its back after the shooting and then was rolled over onto the stomach.

The firearms identification analyst from the state crime laboratory testified that seven pounds of pressure were required to fire the first or forward trigger of the shotgun and five-and-three-quarters pounds of pressure were needed to fire the second or rear trigger. He also testified that when the breach was opened, as had been

done here by the defendant to see if it was loaded, an automatic safety went on and one must manually push a certain bar to release the safety and allow the trigger to be pulled and the gun to discharge. Defendant testified he was not sure how this safety may have been released.

A friend of the defendant testified that he had conversed with the defendant in September of 1973, and that the defendant had said he would like to kill someone sometime "to experience what it would be like to watch the body fall." The defendant had also told him that he had aimed his rifle at another hunter while hunting once but had not fired because a third hunter came along and he was afraid he might be caught.

At the conclusion of the trial, the jury was instructed on both first- and third-degree murder and returned a verdict of guilty of first-degree murder. Following denial of motions after verdict, the trial judge entered a judgment of conviction and sentenced the defendant to a mandatory term of life imprisonment. The defendant now seeks review of his conviction by way of writ of error directed to the judgment.

The question is, was the evidence adduced at trial sufficient to prove the defendant guilty of first-degree murder beyond a reasonable doubt? The defendant does not deny that he shot and killed Mr. Baumann; his testimony shows that he did. The alleged insufficiency is in the evidence which goes not to the act itself but to the defendant's intention at the time the act was committed. Counsel for the defendant contends there was not enough evidence that the defendant fired the gun with intent to kill Mr. Baumann necessary to support a conviction for first-degree murder.[1] It is the contention of the defend-

---

[1] "940.01 **First-degree murder.** (1) Whoever causes the death of another human being with intent to kill that person or another shall be sentenced to life imprisonment.

"(2) In this chapter 'intent to kill' means the mental purpose to take the life of another human being."

ant that he is guilty only of third-degree murder, committed in the course of the felonies of armed robbery and auto theft.[2]

There is no direct testimony that the defendant intended to kill Mr. Baumann and the defendant testified he did not intend to kill him. It is the argument of the defendant that there is nothing in the record of this case to support the essential element of intent to kill. The defendant's argument stresses the allegedly accidental first shot. This ignores, however, the fact that the pathologist testified at trial that Mr. Baumann died from the second shot.

It is well-established law in this state that the element of intent to kill necessary to sustain a first-degree murder conviction may be established by a presumption which may arise from the surrounding facts and circumstances. In *Cupps v. State* (1904), 120 Wis. 504, 513, 514, 97 N. W. 210, 98 N. W. 546:

"When it is made to appear in the prosecution of a case like this that the accused fired the shot, the weapon being aimed at a vital part of the body, and that death ensued as a natural and probable result, the presumption of fact as to intention to take human life, in the absence of any explanatory circumstance or evidence, makes a *prima facie* case for the prosecution. The state is not bound to go further and negative any probability that the occurrence was the result of accident, or that there were circumstances reducing the homicide below that of murder in the first degree, or excusing or justifying it altogether. The accused at that point must take up the burden of rebutting the *prima facie* showing made against him. He must show, by evidence at least sufficiently convincing to raise a reasonable doubt as to the

[2] "940.03 **Third-degree murder.** Whoever in the course of committing or attempting to commit a felony causes the death of another human being as a natural and probable consequence of the commission of or attempt to commit the felony, may be imprisoned not more than 15 years in excess of the maximum provided by law for the felony."

intention to take human life or as to whether such taking was justifiable or excusable, that there was no such intention, justification or excuse, or the jury will be justified in finding him guilty of the highest offense of criminal homicide. That rule is elementary."

*See also: State v. Wells* (1971), 51 Wis. 2d 477, 187 N. W. 2d 328, certiorari denied, 406 U. S. 907, 92 Sup. Ct. 1614, 31 L. Ed. 2d 817; *Zebrowski v. State* (1971), 50 Wis. 2d 715, 185 N. W. 2d 545; *Gelhaar v. State* (1969), 41 Wis. 2d 230, 163 N. W. 2d 609, certiorari denied, 399 U. S. 929, 90 Sup. Ct. 2250, 26 L. Ed. 2d 797; *State v. McCarter* (1967), 36 Wis. 2d 608, 153 N. W. 2d 527.

One is presumed to intend the natural and probable consequences of pointing and discharging a gun at a vital part of another's body.

"Nothing, except a forthright confession or declaration, affords more convincing evidence of the intent to take life than the weapon used." 2 Warren, *Homicide* (perm. ed. 1938), pp. 178, 179, sec. 186.

The presumption or inference is not a conclusive one and may be rebutted by contrary evidence of the defense and such "rebuttal evidence must be considered and evaluated by the trier of fact." *State v. McCarter, supra,* page 612. The inference of intent derived from the circumstances of the killing may stand "in the absence of circumstances repelling the idea." *Farino v. State* (1931), 203 Wis. 374, 379, 234 N. W. 366.

There can be no question here that the inference of intent to kill could be found by the jury from the testimony introduced. The defendant testified that he opened the breach of the shotgun to see if it was loaded. When he closed it after determining that it was loaded, the gun's safety device went on and the crime laboratory expert testified that the safety mechanism was functioning normally. While the defendant testified that he could not

recall releasing the safety, the fact is that he must have done so in order to fire the weapon. The rear trigger required five-and-three-quarters pounds of pressure to fire it. The defendant testified that he was aware and conscious of pulling the second trigger. He offers no explanation for this but merely admits that he did it. The pathologist testified that while the first shot entered the posterior chest area at a horizontal or straight angle, the second and fatal shot entered the anterior or front chest area at a slightly downward angle. The defendant had said that when he shot Mr. Baumann the second time, Mr. Baumann was standing and defendant said he was holding the gun at waist level. The difference in angle of the first and second shot would indicate that the gun had been raised and fired. Defendant's credibility was further undermined; he testified that he shot Mr. Baumann first in front and then, when he turned around, in the back and that he did not move Mr. Baumann's body but only removed the wallet. The pathologist on the other hand testified that Mr. Baumann was shot first in the back, then in the front, and had landed on his back after the second shot and had been rolled over. After the defendant left the scene, he repeatedly denied any part in the shooting when apprehended in Indiana.

The inference of an intent to kill Mr. Baumann which flows from the nature of the actions which caused his death raises a very strong presumption, for which no rebuttal evidence is offered. The jury could reasonably have concluded that both the first and second shots were fired with intent to kill.

This court has on many occasions enunciated the standard to apply when reviewing the sufficiency of evidence to support a criminal conviction:

" 'We have said many times that when the question of the sufficiency of the evidence is presented on appeal in a criminal case the only question for this court is

whether the evidence adduced, believed and rationally considered by the jury, was sufficient to prove the defendants' guilt beyond a reasonable doubt. *State v. Johnson* (1960), 11 Wis. (2d) 130, 137, 104 N. W. (2d) 379; *State v. John* (1960), 11 Wis. (2d) 1, 103 N. W. (2d) 304; *Parke v. State* (1931), 204 Wis. 443, 235 N. W. 775; *State v. Stevens* (1965), 26 Wis. (2d) 451, 132 N. W. (2d) 502. . . . The test is not whether this court is convinced of the guilt of the defendant beyond a reasonable doubt but whether this court can conclude the trier of the facts could, acting reasonably, be convinced to the required degree of certitude by the evidence which it had a right to believe and accept as true.

" '. . . Stating the rule conversely for the sake of clarity, the evidence when considered most favorably to the state and the conviction must be so insufficient in probative value and force that it can be said as a matter of law that no trier of the facts acting reasonably could be convinced to that degree of certitude which the law defines as "beyond a reasonable doubt." ' " *Zebrowski v. State, supra,* at page 723, quoting from *Lock v. State* (1966), 31 Wis. 2d 110, 114, 115, 142 N. W. 2d 183.

We conclude that the test has been satisfied in this case and that the jury acted reasonably when it inferred an intent to kill from the circumstances surrounding the killing of Mr. Baumann. Substantially no evidence was offered by the defense to rebut that very strong inference. The jury acted reasonably in returning a verdict of first rather than third-degree murder.

*By the Court.*—Judgment affirmed.