LARSON, Plaintiff in error, v. STATE, Defendant in error.

Supreme Court

*No. 76-535-CR. Submitted on briefs November 1, 1978.—Decided November 28, 1978.*
(Also reported in 271 N.W.2d 647.)

For the plaintiff in error the cause was submitted on the briefs of *Howard B. Eisenberg,* state public defender, and *Melvin F. Greenberg,* assistant state public defender.

For the defendant in error the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *Marguerite M. Moeller,* assistant attorney general.

CONNOR T. HANSEN, J. Herbert Matthew Heintz died as a result of two gunshot wounds on December 23, 1974. At that time Larson was living with Heintz and his wife.

On December 12, 1975, at 11 p.m., police asked Larson to come to the station to discuss the killing of Heintz. He arrived at the station at 11:30 p.m., was properly advised of his rights, and at 12:20 a.m. agreed to make a formal statement. A detailed six-page longhand statement was written by a police officer based on Larson's answers to questions. The record reveals that each page was read back to him for his approval. He signed the last page of the statement at 1:55 a.m. On one page of the statement a sentence has been obliterated and initialed by Larson. The record reveals this obliterated statement said that Larson did not plan to kill Heintz.

Following a hearing before the trial judge, the statement was found to be voluntary and therefore admissible as evidence at trial.

The statement reflects that on December 23, 1974, Larson, Heintz and Ronald Martin spent the day ice fishing. They went ice fishing about 8:30 a.m. During the day they stopped at a number of taverns and did considerable drinking, including whiskey and a portion of a quart of blackberry brandy.

They returned home around 5 p.m. Heintz left about an hour later. Heintz drove his car into the ditch just down the road from the house and Larson used his car to pull Heintz' car out. They again returned home and had dinner. During dinner Heintz, apparently without provocation, slammed his hands on the table and began to berate his wife with abusive language. He then left the

house. Larson followed him approximately ten minutes later. He found Heintz standing next to his car. Heintz told Larson he was going to go into the house and kill his wife. He went to the garage and got a pipe which was approximately two inches in diameter and 20 inches long. He then started toward the house. As Larson tried to stop him, Heintz hit him on the left side of the neck or shoulder with the pipe, knocking him to the ground. Larson got up, went to his car and got his .22 magnum revolver from the glove compartment. Larson again tried to stop Heintz, saying if he was going to kill anyone he could start with him. Heintz hit Larson with the pipe on the left arm. Heintz then turned to his car and was about to get in when Larson shot him in the back of the head from a distance of two feet. Heintz fell onto the car seat. Larson reached in over the body and, placing the gun against the back of Heintz' head, shot a second time. He waited to make sure Heintz was dead, then pushed his feet inside the car and shut the door. He returned the gun to his glove compartment and went back into the house where he and Mrs. Heintz watched television until about 11 p.m., when he went to bed. He did not mention the shooting.

The next morning Larson moved Heintz' body to the trunk of the car. Two days later he moved the body to the trunk of his own car and took it to a wooded area where he left it. He threw Heintz' keys into the trash at the Heintz residence.

Heintz was reported missing on December 27th. Police searched the home and interviewed Larson and Mrs. Heintz. Heintz' car was taken into custody and blood matching his type was found on the front seat and floor and in the trunk. A body was discovered in the woods in November, 1975. Two .22 magnum bullets were found in the body. Based on their respective positions, the pathologist was able to testify that they entered the left side of the neck and the skull just below the left ear. On

December 1, 1975, the police took a .22 magnum revolver from Larson.

The testimony of Mrs. Heintz substantially corroborated the sequence of events as described by Larson with the exception of the killing itself, which she denied any knowledge of. She testified that Larson and Heintz had been good friends. She said her husband had threatened to kill her several times previously and that Larson knew of these threats. She said her husband was very drunk that evening and that Larson had been drinking but that he was not intoxicated.

Martin, the third member of the fishing party, testified that Larson did not seem intoxicated when he left Larson and Heintz in the late afternoon.

At trial the testimony of Larson confirmed the details of his December 12, 1975, written statement except as to the actual shooting. He testified he intended to shoot over Heintz' head to scare him as Heintz approached him swinging the pipe. He said Heintz appeared to slip slightly at that point but still approached and that was when he shot the second time. He said the left side of Heintz' head was turned toward him when he fired these shots. He said Heintz' body fell next to the open car door with his head and shoulders inside the car between the seat and the center post. He said he shoved Heintz' body up onto the front seat. He testified that on the day of the killing he had had quite a few drinks but was not completely intoxicated.

Larson also testified because he was intoxicated on December 12, 1975, when he made the statement to police, he did not understand what they were saying. He said he told one of the officers a couple days later, when he had had the opportunity to read the statement, that it was inaccurate. He particularly objected to the statement that he shot Heintz in the back of the head while he was in the car to make sure he was dead. He testi-

fied that he told the officers the same story he told at trial. The police officers who took the statement said that although they could tell Larson had been drinking that night, he did not appear intoxicated. They said the statement accurately related what Larson had said and they denied that he had challenged its accuracy several days later.

The trial court instructed the jury on first-degree murder, sec. 940.01, Stats.; second-degree murder under sec. 940.02; and manslaughter, self-defense, sec. 940.05(2).

The following issues are presented on this review:

1. Did the trial court err in refusing to submit an instruction on intoxication negating state-of-mind essential to a crime?

2. Did the trial court err in misstating a portion of the manslaughter instruction?

3. Is the evidence sufficient to sustain a conviction for first-degree murder?

4. Should a new trial be granted in the interests of justice?

5. Did the trial court err in denying Larson credit for preconviction incarceration?

Larson requested a jury instruction on intoxication negating the existence of a state-of-mind essential to the crime.

Sec. 939.42(2), Stats., provides in pertinent part:

"939.42 **Intoxication.** An intoxicated or a drugged condition of the actor is a defense only if such condition:
". . .
"(2) Negatives the existence of a state of mind essential to the crime."

The trial court denied this request of Larson on the grounds that there was not sufficient evidence to warrant giving it. The trial court said before he could give such an instruction he would have to take judicial notice that the drinking Larson did that day would cause the

degree of intoxication necessary to provide a defense. He concluded that Larson's own testimony regarding his lack of intoxication precluded giving the instruction.

In evaluating the evidence to determine whether a particular instruction is appropriate the court is to determine whether the evidence reasonably requires it.

Commenting on the evidence necessary to support this particular defense, this court stated in *State v. Guiden*, 46 Wis.2d 328, 331, 174 N.W.2d 488 (1970) :

". . . The 'intoxicated or drugged condition' to which the statute refers is not the condition of alcohol-induced incandescence or being well-lit that lowers the threshold of inhibitions or stirs the impulse to criminal adventures. It is that degree of complete drunkenness which makes a person incapable of forming intent to perform an act or commit a crime. . . ."

The degree of a defendant's intoxication may be determined from his conduct, his own testimony regarding his condition, and the testimony of witnesses. *Staples v. State*, 74 Wis.2d 13, 21, 22, 245 N.W.2d 679 (1976) ; *State v. Nemoir*, 62 Wis.2d 206, 211, 214 N.W.2d 297 (1974). This instruction is proper only where, viewing the evidence in the light most favorable to the defendant, a jury could reasonably have found that he was so intoxicated that he lacked the intent to kill. *State v. Verhasselt*, 83 Wis.2d 647, 667, 266 N.W.2d 342 (1978) ; *Jones v. State*, 69 Wis.2d 337, 346, 230 N.W.2d 677 (1975).

The evidence here did not warrant giving the instruction. Any attempt to justify the giving of such an instruction would have been based upon inferences drawn from the testimony of Larson as to the amount of intoxicating liquor he consumed between 8:30 a.m. and 8 p.m. on December 23, 1974. However, Mrs. Heintz and Ronald Martin testified that Larson did not appear intoxi-

cated. Larson, himself, testified he was not completely intoxicated. Furthermore he testified he pulled Heintz' car out of the ditch that evening. His detailed statement of the events of December 23, 1974, given to the police on December 12, 1975, demonstrates a remarkable recollection of what happened on the day of the killing.

The requested instruction was properly refused.

Larson next contends that a misstatement of the trial court in the manslaughter instruction prevented the jury from considering manslaughter as a possible verdict.

The rule is that a party must object to an improper or incomplete instruction before the jury returns with a verdict in order to preserve the error on appeal, but where an instruction misstates the law the error is preserved if used as a ground for a motion for a new trial. *Randolph v. State,* 83 Wis.2d 630, 638, 266 N.W.2d 334 (1978) ; *Lambert v. State,* 73 Wis.2d 590, 607, 243 N.W. 2d 524 (1976). There was no objection to the instruction in this case.

In the present case, the trial court fully and correctly instructed the jury on each of the verdicts submitted, first and second-degree murder and manslaughter, self-defense.

After correctly giving the instruction on manslaughter, self-defense, the trial court concluded by stating:

". . . If you are'nt [sic] satisfied beyond a reasonable doubt from the evidence in this case that the defendant caused the death of Herbert Matthew Heintz in a manner constituting murder in the first or second degree, but you find that the defendant committed the act causing Herbert Matthew Heintz' death, believing that his act was necessary in self defense but that his belief was unreasonable under the circumstances, then you should find the defendant guilty of manslaughter. If, however, you are not so satisfied, then you must find the defendant not guilty."

The first sentence of the instruction should have been, "If you *are* satisfied. . . ." The question is whether the error was prejudicial.

A misstatement of law in an instruction is reversible error only where it reasonably appears that the verdict would have been different if the error had not been committed. *Werner v. State,* 66 Wis.2d 736, 750, 226 N.W. 2d 402 (1975); *Claybrooks v. State,* 50 Wis.2d 79, 86, 183 N.W.2d 139 (1971). When this court is considering alleged error in jury instructions, such instructions are to be considered in their entirety and if the error is rendered harmless because of other correct statements of the law contained in the instructions, there are no grounds for reversal. *Loveday v. State,* 74 Wis.2d 503, 518, 247 N.W.2d 116 (1976).

In this case the record demonstrates the trial court correctly and fully instructed on each of the elements of manslaughter, self-defense, particularly the first element by stating "First, there must exist all the elements of either first or second degree murder as I have defined them for you." The instruction on the elements of manslaughter made it clear to the jury what facts a manslaughter verdict would require.

Larson excises one word from a summation paragraph, after the elements of the crime have been correctly set forth in the instructions and argues reversal. However, as this court has repeatedly held, instructions given by the trial court are to be considered in their entirey and in determining whether there is reversible error they must be considered as a whole. *Kimmons v. State,* 51 Wis.2d 266, 268, 186 N.W.2d 308 (1971); *State v. Davidson,* 44 Wis.2d 177, 190, 170 N.W.2d 755 (1969).

From our examination of the entire record and viewing the instructions in their entirety and considering them as a whole, there is no basis to hold that the al-

leged error affects a substantial right of the plaintiff in error.

Larson next contends that the evidence is insufficient to support a conviction of first-degree murder. This contention is based primarily on the fact that in his statement to the police on December 12, 1975, he said he shot Heintz in the back of the head. Whereas, Dr. Robert W. Huntington, a pathologist, testified the shots entered behind the left ear and in the left side of the neck. Hence, argues Larson, his statement to the police is incredible in light of the physical facts and the substance of the entire statement must be ignored and without his statement there is no evidence of intent to kill. The argument has no merit.

Evidence is incredible if it is in conflict with the uniform course of nature or with fully established facts. *State v. Oliver*, 84 Wis.2d 316, 324, 267 N.W.2d 333 (1978). As the pathologist explained, if one takes the back of the head to mean the part behind the face, the findings of the pathologist are not inconsistent with the December 12, 1975, statement of Larson.

A conviction may rest on a defendant's confession where any significant fact is corroborated. *Schultz v. State*, 82 Wis.2d 737, 753, 264 N.W.2d 245 (1978). Here every fact in Larson's statement, except for those relating to the murder itself, was corroborated. On review the test of sufficiency is whether a jury, acting reasonably, could be convinced of the defendant's guilt beyond a reasonable doubt. *Id.* at 751; *Strait v. State*, 41 Wis.2d 552, 559, 164 N.W.2d 505 (1969).

Larson does not now contend that he did not cause Heintz' death. He argues only with the finding of intent.

This cause has recognized the presumption that a person intends the natural and probable consequences of his

acts voluntarily and knowingly performed. *Schimmel v. State*, 84 Wis.2d 287, 300, 301, 267 N.W.2d 271 (1978). This rule has been applied specifically in murder cases by holding that there is a presumption of intent to kill where the defendant shoots the victim in a vital part. *Lofton v. State*, 83 Wis.2d 472, 478, 266 N.W.2d 576 (1978); *Smith v. State*, 69 Wis.2d 297, 303, 230 N.W.2d 858 (1975). This presumption can be rebutted by evidence from the defense that there was a justification or excuse for the act. *Smith, supra.* The intent to kill can also be inferred from the circumstances surrounding the crime. *Id.*

The jury here had Larson's own statement that he ran away from Heintz to his car to get his loaded revolver and that he ran back to Heintz who at first swung the pipe at Larson but then started to get into his car. At this point Larson shot Heintz in the back of the head, then shot a second time to make sure that Heintz was dead. That the jury found this homicide intentional and not an act of self-defense is not unreasonable. Larson was sixteen years younger, four inches taller, and twenty pounds heavier than Heintz. Even if the first shot could be considered something less than intentional, the second shot, for which he placed his gun against Heintz' skull, supports the jury finding an intent to kill.

This is not a case in which the evidence considered most favorably to the conviction is so insufficient in probative value that it can be said as a matter of law that no trier of fact acting reasonably could be convinced of guilt beyond a reasonable doubt. *Lock v. State*, 31 Wis. 2d 110, 115, 142 N.W.2d 183 (1966).

No additional arguments are advanced to support the contention that a new trial should be granted in the

interest of justice. In essence Larson argues that the cumulative effect of the alleged trial court errors warrant the granting of a new trial in the interest of justice. Since we have held each of such arguments to be without substance, certainly all of them together do not require it. *Mentek v. State,* 71 Wis.2d 799, 809, 238 N.W.2d 752 (1976). There is no evidence in this record that Larson should not have been convicted of the crime charged or that a new trial would produce a different result. *White v. State,* 45 Wis.2d 672, 681, 173 N.W.2d 649 (1970).

Finally, Larson argues that the trial court erred in denying him credit for preconviction incarceration.

This issue has been disposed of by ch. 353, Laws of 1977, which was effective May 17, 1978. This legislative enactment created sec. 973.155, Stats., which provides retroactive sentence credit for offenders already in custody. In an amendment to sec. 57.06(1)(a), this credit is made available to those who are serving a life sentence.

If Larson believes he is entitled to such preincarceration credit, his remedy is to now pursue the matter by petition to the department of health & social services as provided in sec. 973.155(5), Stats.

The judgment of conviction and order denying the motion for a new trial are affirmed.

*By the Court.*—Judgment and order affirmed.