STATE, Plaintiff-Respondent, v. LATENDER,
Defendant-Appellant.

Supreme Court

*No. 76–134–CR. Submitted on briefs November 29, 1978.—*
*Decided January 9, 1979.*
(Also reported in 273 N.W.2d 260.)

For the appellant the cause was submitted on the briefs of *Jerome A. Maeder, Kenneth J. Andraski* and *Jerome A. Maeder, S.C.,* of Wausau.

For the respondent the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *Michael R. Klos,* assistant attorney general.

CONNOR T. HANSEN, J.    On appeal the appellant challenges the jurisdiction of the trial court, the sentences imposed and the sufficiency of the evidence.

There were six different victims in these prosecutions. The result is a somewhat lengthy statement of facts.

Appellant is a Menominee Indian who, at the time of the events which led to these convictions, was living on the Menominee Reservation. The charges against him arose out of events which occurred on November 1, 1975, on the Menominee Reservation. The facts we relate were testified to at a jury trial held in Columbia county on June 1–4, 1976.

Appellant and his girl friend, Brenda LaRock, met Gordon Long, the victim in one of the endangering safety counts, and his wife in a tavern about 2 p.m. on November 1st. Appellant and Long argued at that time over control of the pool table. About 4 p.m. the same day as Audrey Long was driving the car with her husband and daughter, and Mike Long and Wendell LaRock as passengers they passed appellant walking along the highway. Mrs. Long stopped and picked appellant up at LaRock's request. They drove him to Neil Hawpetoss' house near Keshena Falls where appellant was then residing. Appellant went into the house and returned to the car with a gun and some beer. Gordon Long testified that the gun looked like an M–16; his wife described it as a machine gun.

They drove appellant back to the LaRock home so he could ask Brenda where the clips for the gun were. Audrey Long testified that after they all went into the house she got the gun from the car, took it in to Brenda and asked her to hide it. Brenda admitted that Mrs. Long had brought the gun into the house but said she thought Mrs. Long was just trying to do something "sneaky." Appellant brought the gun back to the car and they all returned to the Keshena Falls home. Appellant and Brenda went into the house and appellant returned alone with a gun clip. Brenda remained in the house and Audrey and Mike Long and Audrey's daughter remained in the car while appellant, Gordon Long and Wendell LaRock went over to the riverbank near the house. The three men took turns shooting the gun at a rock in the river.

Gordon Long said that he took only one shot then handed the gun back to appellant and said, " 'boy, that's a pretty good gun.' " He said appellant responded, " 'Don't call me boy,' " and pointed the gun at Long's stomach. He testified appellant then said, " 'Who am

I?'" and when Long replied that he didn't know who he was appellant shot across the river again, then shot along the right side of Long's head with the gun barrel about a foot away. Long said appellant next aimed the gun between his eyes with the muzzle about six inches away and said " 'I could drop you where you stand.' " Long said he replied, " 'I know you could.' " He said appellant held the gun there from 30 to 60 seconds but calmed somewhat and lowered the gun when Long said " 'I don't know who you are, you are just a brother.' " Appellant then invited Long into the house. Long left with his wife as soon as appellant entered the house and went to the police to report the incident. Long testified that he was not an Indian but that he had a little Indian blood. He thought the incident occurred between 4:30 and 5 p.m.

Audrey Long testified that she saw appellant aim the gun between her husband's eyes, then saw him lower the gun and shoot it with the barrel level next to Long's ear. She said she went into the house to get Brenda to talk to appellant but that Brenda refused. Brenda admitted that Mrs. Long came into the house and asked if appellant would do anything to them. At this point appellant and LaRock came back to the house and the Longs left.

Brenda LaRock testified that while she was in the house she heard shooting but did not watch and did not see any of the events described.

Appellant testified that he had not known Long before but that he had gotten the impression he was a "sneak." He said he was looking for the shell clips so he could show the gun off to Long and LaRock. He said the gun was an AR–15 he had found near Gresham Abbey. He said he was shooting across the river when Long said " 'Boy, . . . that's pretty cool.' " He said he then turned toward Long and fired one shot with the gun

pointed up and to the side of Long's head with the muzzle extending beyond Long's head so he couldn't hit him. He said he then spun around and rapidly fired four shots across the river until a clicking sound told him the gun was empty. He said he took the clip out and snapped it in again to make sure. He said at this point he aimed the gun between Long's eyes and said, jokingly, to scare Long, " 'You fool, you want to die,' " or " 'you want to get shot.' " He said Long then apologized and he asked Long in for a drink but Long left.

A Menominee county deputy sheriff testified that he was notified that the Longs wanted to make a complaint around 5:30 p.m. He said when he took the complaint from Long between 6 and 6:30 p.m. Long appeared to be sober but nervous.

Shortly after the Longs left a second group arrived which included two Menominee Indians, Mark Vigue and John Haack, and three whites, Terry Erickson, Wanda Bero and Donald Bohardt. Vigue, Haack and Erickson were the victims in three of the endangering safety counts; Wanda Bero, the victim in the reckless use of a firearm count; and Donald Bohardt, the victim in the first-degree murder count. The five had spent the afternoon drinking at Haack's home and went to appellant's at Haack's suggestion to see if he wanted to join them. Haack went into the house alone. Haack was subpoenaed but did not appear at trial to testify.

Brenda LaRock testified that Haack asked them if they wanted to buy some marijuana. She said appellant said no. She further testified that Haack said some people from Neopit were in the car and appellant told Haack to tell them to come in. Haack refused so appellant went to the porch. Mark Vigue then came in and he asked if they wanted to smoke marijuana and appellant answered that they didn't. Appellant, LaRock, Vigue and Haack then went outside but she remained in the house.

Vigue testified that he went into the house because appellant came out onto the porch and waved for them to come in. When he entered the house appellant motioned for him to throw him the gun clip which was laying on a table, and he did so. They went outside and were about to get into the car to leave when appellant came out carrying the gun.

Appellant testified that Haack asked if they wanted some dope and that he replied they did not. He offered Haack a beer and Haack accepted and said he would call the others in. Haack went out but returned saying the others didn't want to come in. Appellant asked who was out there and Haack replied they were from Neopit. Appellant went to the door and motioned them in and Mark Vigue came in and Haack introduced him to appellant. The car horn honked and he asked who else was out there; Haack replied that Terry Erickson was, then left. He followed Haack out with the gun because he knew Terry Erickson pushed dope and Erickson had tried to sell him some the night before.

Mark Vigue also testified that as he and Haack were about to get into the car appellant came out of the house with the gun, approached them and, without saying anything, hit him alongside the head with the gun barrel. Haack asked appellant why he did that and appellant turned to Haack and started hitting him with his fists in the face. Appellant yelled at Haack for bringing white honkies or white dogs there. He said Haack sustained a cut lip and a scratch where his glasses broke. Appellant ordered everyone out of the car and demanded they turn over their marijuana. Appellant laid the gun on the roof of the car aimed at Terry Erickson and said he was going to put one between his eyes; Erickson ducked so appellant placed the gun barrel to Vigue's throat and said " 'You know what I mean.' " Vigue said he replied, " 'What?' " and appellant lowered the gun, fired a shot by his feet

and said, " 'Now you know what I mean.' " Vigue responded that he did and appellant said, " 'Well then, do it.' " Appellant turned to berate Haack again and then walked behind the car and fired a couple shots at the ground. He shot again through the back window as Erickson was getting into the car. Erickson jumped out, pushed the gun barrel away and ran for the woods. Appellant shot after Erickson a couple times and it appeared that one shot hit a tree Erickson was hiding behind. Appellant called to Erickson to come out, then put the gun to Wanda Bero's head and said, " 'You better get your boyfriend out of the woods or I'm going to kill you.' " Donald Bohardt said he would go get Erickson and he started walking down the road. Appellant told Bohardt he'd better get him out, then followed Bohardt, taking Wanda along with him by holding the gun to her head. Shortly after they disappeared from view, Vigue said he and Haack heard a shot. Brenda told them they'd better get out of there so they drove off in the opposite direction. They went to a nearby restaurant and called the police.

Terry Erickson testified that when Vigue and Haack came out of the house, Haack said they should get out of there because the appellant was going crazy and had a gun. Appellant then came out of the house with the gun, ejected a shell from it and ordered them out of the car. Erickson described the gun as an automatic, service-type weapon, either an M–16 or AR–15. Appellant then hit Vigue across the face with the gun and said " 'What are you white dogs doing here on the Reservation at my house?' " Appellant swore at Haack for bringing " 'white dogs' " on the reservation. Haack asked appellant to let them leave but appellant hit him once with the gun and several more times with his fist. Appellant fired a shot at or near Vigue's legs from three feet away and this shot hit near Vigue's

feet. Appellant then demanded everything they had and Erickson said he gave appellant his jacket and some pot but did not give him his wallet since he had no money in it. Appellant then ordered them to open the trunk; pointed the gun in his face and he begged appellant to let them leave. He then went to the car to show appellant there was nothing there but appellant shot through the back window of the car just as he was getting in. Splinters of glass lodged in his moustache and cut his face, which splinters were later removed at the hospital. He backed out of the car and appellant came around and again pointed the gun at him. He grabbed the gun barrel, pushed it away and ran for the woods. Appellant shot after him a couple times with one shot hitting next to his feet as he stood behind a tree.

Erickson also testified that he stayed inside the woods at a point where he could see and not be seen. Donald Bohardt followed Erickson into the woods. Meanwhile Wanda was calling to him saying if he didn't come out appellant would kill her. He could see appellant walking along the road holding Wanda by the back of the neck with the gun to her head. LaRock was next to appellant. Bohardt left the woods to help Wanda, and he was immediately grabbed by appellant and LaRock grabbed Wanda. Appellant shot into the brush at the point where Bohardt emerged from the woods and near where he was standing. To avoid these shots he lay down next to a log for about ten minutes. He heard another two or three shots as he lay there, then saw Brenda walking down the road alone and after she passed he ran across the road and climbed a pine tree. He then heard two or three separate shots followed by a rapid fire of three shots from the direction of the river. He did not see anyone return to the house, but admitted they could have done so without his noticing. Ten or fifteen minutes

later he saw the lights go out in the house; he then climbed down, ran for the highway and made his way to the mission where he waited until the missionary took him to the police.

Wanda Bero testified that Haack had said they should leave right away, but that appellant came out of the house carrying the gun and ordered them out of the car. She said he called them white s.o.b.'s and white dogs and yelled at Haack for bringing them there. Appellant struck Haack twice in the face with the gun barrel and demanded their wallets and they all threw them in, including Erickson. He also asked for the key to the trunk and when they said they didn't have one, told Erickson to look in the car for a screwdriver, at which time the appellant shot through the back window. Erickson tried to take the gun away but stopped and ran when someone told him to let go. Appellant shot after Erickson then told her to get her white boyfriend out of the woods or he would kill her. He pointed the gun towards her and Bohardt, then fired the gun towards the woods again. LaRock then took her by the shoulder and pushed her along the road with Bohardt and appellant behind them.

Bero further testified she called repeatedly for Erickson to come out and appellant kept the gun aimed at her. When they reached the bridge appellant again told her to get her white boyfriend out of the woods or he would kill her, pointed the gun at her head, then lowered it and fired so close to her legs that she sustained a powder burn on the right thigh. Leaving appellant and Bohardt at one end of the bridge, LaRock then led her across the bridge and under it on the other side of the river where he raped her. She said she heard a shot while they were under the bridge and that after raping her, LaRock allowed her to leave, but warned her not to tell the police. LaRock followed her to a nearby grocery store where she got a ride into Shawano from a group of girls.

Wanda provided police with a written statement, portions of which were introduced at the trial. The statement did not mention hearing the shot and indicates LaRock said they would both be dead if she called the police. At trial Wanda said she did not know why she failed to mention the shot in the statement and she did not remember LaRock using the word " 'both.' "

Brenda LaRock testified that when appellant left the house with the gun she heard him say to Erickson, from the porch, ". . . So you're the one that's been up here selling dope to the Indians. . . ." She said she looked out the window and saw Erickson, Bohardt and Bero standing on one side of the car and Vigue and Haack on the other. She stepped away from the window but returned when she heard hollering and saw Erickson getting into the back seat of the car on the passenger side. She saw something metallic flash from underneath the seat of the car and thought he must be getting a gun, because she had once heard Erickson say he had "protection." She then went into the kitchen but returned to the window when she heard a shot. At this point she noticed that the back window of the car was shattered and Erickson was standing next to the car. She again left the window but heard several more shots. When she looked out again several minutes later she saw Bohardt walking down the road and Bero standing by the road calling to Erickson to come out of the woods and Bero then started down the road with the appellant and LaRock following.

Brenda also testified when she then came out onto the porch, Haack came up to her and asked if he could go in and wash the blood off his face. Haack and Vigue stood there discussing what they should do. They acted frightened and afraid something would happen to them so she suggested that they leave. They drove off in the direction opposite from that which the rest had taken and yelled back that they were going to

call the police. She then started down the road in the direction the others had taken, heard two shots while she was walking, and eventually came upon appellant and Bohardt. She heard Bohardt ask where the highway was so he could get out of there and saw appellant point the direction out. She heard appellant say " '. . .There's the road . . . get the hell out of here. . .' " She then turned back but appellant caught up with her. She said she didn't hear any shots after she left Bohardt and appellant and she and appellant finally returned to the house, put the gun under the mattress and left after about fifteen minutes. They turned out the lights as they left and walked back to the bridge but didn't see anyone on the way. She denied seeing appellant and Bohardt on or near the bridge.

Appellant testified that Bero, Bohardt and Erickson were not leaving, but instead got out of the car when he came out on the porch. However, on cross-examination he said he told them to get out of the car because he wanted to see Erickson. He said he would have let them leave after he beat up Erickson and explained that he took the gun with him to make them leave and because those four men could have jumped him. He told Haack he should have more sense than to bring Erickson around there and Haack replied that Erickson was his partner and was OK. Appellant said he told Haack he didn't like that group being around there but that Haack continued to defend Erickson so he hit him once with the gun barrel and told them to get out of there. Haack's glasses broke and cut him above the nose and he said Vigue then began to defend Erickson so he continued to quarrel with Vigue and Haack about it. He denied using the term " 'white dogs.' " He said he put the clip in the gun, aimed at the ground and fired near Vigue's feet; hit Vigue with the gun barrel, and he told Vigue, ". . . '[n]ow man,

you know what I'm talking about. . .' " He then walked
to the back of the car and told Erickson to get the
dope out of there. He denied asking for money or
for Erickson's jacket. He said Erickson did not take
off his jacket but did remove a bag of marijuana from
his pocket and that Erickson told him there wasn't
any dope in the car and opened the car door and reached
in to show him. Appellant said he fired a shot through
the back window of the car at that point because he
knew Erickson carried a gun and thought that's what
he was reaching for. Erickson then ran for the woods
and he fired several shots into the air after him.

Appellant further testified he told Bero to get Erickson
out of the woods, but denied threatening to kill her,
that she added that herself when she started calling
to Erickson. He denied aiming the gun at Bero or
shooting near her right leg but admitted, on cross-
examination, that he fired the gun into the air near her.
He also denied aiming the gun at Bohardt, but admitted
firing shots into the air behind him as he entered
the woods. He had never met Bohardt before and had
not heard of him. When Bohardt came out of the woods
he and Bohardt followed Bero down the road and LaRock
caught up with them. He admitted firing towards the
woods but said the gun was angled up. He and Bohardt
stopped on the road near some houses and LaRock and
Bero continued on. He heard movement in the woods
behind the houses so he went behind the houses and
fired two shots in the air. He then returned to the
road where Bohardt asked him how to get out of
there, he gave Bohardt directions, and then went back
behind the houses again, but since the clip was empty
he did not fire any shots. Bohardt was still on the
road when he returned and Brenda was approaching.
Bohardt asked again for directions, he gave them and
Bohardt left. He said he never threatened Bohardt or

pointed the gun at him, they never went to the bridge and he had no reason to kill Bohardt. He said he caught up with Brenda and returned to the house and he drank two beers there before they left and walked into Keshena.

Because of the report made by Vigue and Haack police started arriving at the bridge area around 7 p.m. Initially they were looking for appellant and Erickson, but as additional reports came in they also started looking for Bohardt. They searched the area for most of the night and about 7:00 the following morning, Bohardt's body was found hung up on a log in the river about 15 feet downstream of the bridge. Traces of type O blood were found on the bridge and brain tissue was found on a ledge below the bridge. Appellant, Bohardt, Haack and Vigue all had type O blood. Three shell casings were found in a spot below the place the tissue was found. The ballistics' report stated that the three casings were all from the same gun and were consistent with cases fired from an AR–15 or M–16 model rifle, but the possibility could not be excluded that they were fired from another model with similar characteristics.

The pathologist testified that when he examined the body at 3:40 p.m. on November 2nd, Bohardt had been dead not more than 24 hours. He said the first and fatal bullet entered on the right side of the neck and transected the spinal cord, causing respiratory paralysis within five minutes. A second bullet entered the head above and behind the left ear and from the nature of the wounds it appeared the bullets would have been a high velocity type.

Appellant presented several witnesses who established his whereabouts from approximately 6:30 that evening until his arrest a couple hours later. This testimony was apparently introduced in an attempt to show that if

appellant hadn't killed Bohardt prior to leaving the Keshena Falls house he could not have done so later. Since the state's case rested on the premise that appellant killed Bohardt when they were alone at the bridge between 6 and 6:15 p.m., this testimony regarding the appellant's activities later that evening is not of particular significance.

The jury found appellant guilty of the murder of Donald Bohardt, of endangering the safety of Haack, Vigue, Erickson and Long, and of reckless use of a firearm towards Bero. This appeal presents the following issues:

1. Was the evidence sufficient to support the convictions of first-degree murder and endangering safety by conduct regardless of life?

2. Does the state have jurisdiction over crimes committed by a Menominee Indian on the reservation?

3. Do the consecutive sentences here constitute cruel and unusual punishment?

4. Does the failure of a victim to appear and testify at trial violate a defendant's right to confront the witnesses against him?

The appellant advances the argument that there was not sufficient evidence to support the conviction of the murder of Donald Bohardt.

The test is whether the evidence adduced, believed and rationally considered by the jury was sufficient to prove the defendant's guilt beyond a reasonable doubt. Before a conviction can be overturned,

". . . the evidence when considered most favorably to the state and the conviction must be so insufficient in probative value and force that it can be said as a matter of law that no trier of the facts acting reasonably could be convinced to that degree of certitude which the law defines as 'beyond a reasonable doubt.'" *Lock v. State,* 31 Wis.2d 110, 115, 142 N.W.2d 183 (1966).

A conviction of first-degree murder requires a jury to find that the defendant caused the death and that he intended to kill the victim. These findings may rest on circumstantial evidence. In *Garcia v. State,* 73 Wis.2d 174, 182, 242 N.W.2d 919 (1976), this court explained:

". . . Inferences drawn from circumstantial evidence must be reasonable and not conjectural, *State ex rel. Kanieski v. Gagnon, supra.* The evidence must be sufficient to exclude from the realm of probability, as opposed to possibility, any theory of the defendant's innocence."

Bohardt was shot twice with a high-powered rifle, once in the neck and once in the head, the first shot caused his death.

The presumption is that a person intends the natural and probable consequences of his acts voluntarily and knowingly performed. *Schimmel v. State,* 84 Wis.2d 287, 300, 301, 267 N.W.2d 271 (1978). This rule has been applied specifically in murder cases by holding that there is presumption of intent to kill where the defendant shoots the victim in a vital part. *Lofton v. State,* 83 Wis.2d 472, 478, 266 N.W.2d 576 (1978); *Smith v. State,* 69 Wis.2d 297, 303, 230 N.W.2d 858 (1975). This presumption can be rebutted by evidence from the defense that there was a justification or excuse for the act. *Smith, supra.* The intent to kill can also be inferred from the circumstances surrounding the crime. *Id.*

Appellant challenges the state's case against him on numerous grounds. He contends that the failure of the pathologist to fix the time of death more definitely than within 24 hours allows an inference that Bohardt was murdered after appellant left him. He contends

that nothing tied his gun to the shell casings found at the bridge and nothing tied the casings to Bohardt's wounds. He contends that Bero's testimony that she heard one shot creates an inconsistency in light of the other evidence. He contends that Wendell LaRock and Terry Erickson had motives for killing Bohardt, but he did not.

He contends that Bero's testimony was incredible because she failed to mention the shot she heard in her statement to police. He says it is clear, from the fact that Wendell LaRock said he would kill *both* of them if she reported the rape to the police and from the fact that she did not mention the shot initially, that they both believed that Bohardt was still alive. This argument is not impressive. No reason is advanced as to why Bero and LaRock should not have believed Bohardt was still alive. Despite all the shooting that had taken place, no one had been shot. There would be no reason for them to conclude that the shot they heard during the sexual assault had killed Donald Bohardt. Bero's failure to mention that last shot in her written statement to police is not surprising.

With regard to the time of the murder and the whereabouts of the gun, the jury had evidence that appellant was the last person to see Bohardt alive, at or near the spot where the murder apparently occurred; that appellant was carrying an AR–15 rifle which he had repeatedly shot at and near Bohardt and his friends; that at least one shot was heard by Bero after Bohardt and appellant were left alone and Erickson heard six shots in this time period; that blood stains and tissue corresponding to Bohardt's were found on the bridge, three shell casings consistent with an AR–15 were found beneath the bridge and Bohardt's wounds were caused by high velocity bullets. This evidence, although circumstantial, satisfies the following test:

" '. . . "that all the facts necessary to·warrant a conviction on circumstantial evidence must be consistent with each other and with the main fact sought to be proved and the circumstances taken together must be of a conclusive nature leading on the whole to a satisfactory conclusion and producing in effect a reasonable and moral certainty that the accused and no other person committed the offense charged." The circumstantial evidence must, however, be sufficiently strong to exclude every reasonable theory of innocence, that is, the evidence must be inconsistent with any reasonable hypothesis of innocence. This is a question of probability, not possibility.' . . ." *State ex rel. Hussong v. Froelich,* 62 Wis.2d 577, 586, 215 N.W.2d 390 (1974).

The appellant's theory that one of the members of the Bohardt group shot him at the Keshena Falls bridge is simply not a reasonable conclusion based upon the evidence presented at the trial.

The first-degree murder verdict is a reasonable conclusion based upon the evidence presented and there is sufficient credible evidence to support the verdict of the jury.

Appellant also was convicted of four counts of endangering safety by conduct regardless of life contrary to sec. 941.30, Stats.:

"941.30 **Endangering safety by conduct regardless of life.** Whoever endangers another's safety by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life, may be fined not more than $1,000 or imprisoned not more than 5 years or both."

A conviction under this section requires proof of three elements, (1) conduct imminently dangerous to another, (2) which evinces a depraved mind, and (3) the safety of another is actually endangered. *State v. Kuta,* 68 Wis.2d 641, 644, 229 N.W.2d 580 (1975). Appellant

contends the conduct he displayed did not evince a depraved mind. He points out that no injury resulted. Although injury might assist in proving "depraved mind," actual injury is not required for a conviction under this section. *State v. Olson,* 75 Wis.2d 575, 592, 250 N.W.2d 12 (1977).

This court recently found sec. 941.30, Stats., to be a constitutionally valid enactment in *Balistreri v. State,* 83 Wis.2d 440, 265 N.W.2d 290 (1978). The conviction there was overturned because the conduct was not found to be imminently dangerous and the court therefore did not discuss the element of depraved mind. The court held that this crime did not require a specific intent, only a general intent to do the acts and a consciousness of the nature of the acts. The case also states that the three elements are to be found in the act itself and the circumstances of its commission.

In *State v. Weso,* 60 Wis.2d 404, 410–412, 210 N.W.2d 442 (1973), the court defined "depraved mind" as follows:

"A depraved mind must be indifferent to the life of others. . . .

"To constitute a depraved mind, more than a high degree of negligence or recklessness must exist. The mind must not only disregard the safety of another but be devoid of regard for the life of another. . . . It is not necessary that the proof show a depraved mind in fact in the accused; it is sufficient that the conduct of the accused evinces or shows a state of mind which is generally considered by mankind to be a depraved mind. 'Depraved' as a verb means to pervert and as an adjective it means 'marked by debasement, corruption, perversion, or deterioration.' . . . A depraved mind lacks a moral sense, an appreciation of life, is unreasonable and lacks judgment. . . . The excessiveness of the conduct in relation to its purpose, the nature of the conduct and the disregard for the possible result of such conduct

evinces an unreasonable mind in that it lacked balance, a moral sense, and judgment and hence was depraved."

In *Weso* the court found that slashing at the victim's face with a knife during a fight was sufficient to show a depraved mind.

In *State v. Dolan,* 44 Wis.2d 68, 170 N.W.2d 822 (1969), the court concluded that the defendant's conduct in poking the victim in the stomach with a knife and holding the knife to his throat while threatening to cut him in order to force the victim to do his will sufficiently demonstrated a depraved mind.

Aiming a loaded gun at a vital part of a person's body at close range coupled with threats to kill has been held to show a depraved mind in *State v. Kuta, supra,* and *Kwosek v. State,* 60 Wis.2d 276, 208 N.W.2d 308 (1973). Shooting at another was found to be sufficient evidence in *State v. Melvin,* 49 Wis.2d 246, 181 N.W.2d 490 (1970), and *State v. Cassel,* 48 Wis.2d 619, 180 N.W.2d 607 (1970).

There was evidence that appellant aimed the gun between Gordon Long's eyes, fired it inches from his head and threatened to kill Long, all because he thought Long had called him "boy."

There was evidence that appellant aimed the gun at Terry Erickson across the car roof and threatened to kill him, fired through the car window in the direction of Erickson and fired after him as he ran into the woods. One of those shots hit near Erickson's feet.

There was evidence that appellant hit Mark Vigue in the head with gun barrel, placed the gun at Vigue's throat and threatened to shoot and fired near Vigue's feet.

There was evidence that appellant struck John Haack in the face several times with his fists and the gun barrel. Although there was no direct evidence that the gun was aimed directly at Haack, he was in the

immediate vicinity during appellant's frequent random shots at the ground and into the air.

This conduct amply demonstrates a "depraved mind." As the court said in *Kwosek v. State, supra,* at 280:

". . . One can become so obsessed with the righteousness of his cause that his mind acts unreasonably and reaches that state of depravity which constitutes an element of the crime of endangering safety of another by conduct regardless of life under sec. 941.30, Stats. . . ."

Appellant asks this court to reconsider its holding in *State ex rel. Pyatskowit v. Montour,* 72 Wis.2d 277, 240 N.W.2d 186 (1976), that the state has jurisdiction over crimes committed by Menominee Indians on the reservation for a transitional period under the Menominee Restoration Act, 25 U.S.C. sec. 903–903f. This court further held that 18 U.S.C., sec. 1162, which granted Wisconsin full criminal jurisdiction over the state's Indian country had not been repealed by the Menominee Restoration Act as of the date of *Pyatskowit.*

The same conclusion was subsequently reached in *Application of Nacotee,* 389 Fed. Supp. 784, *remanded without opinion,* 525 Fed.2d 694 (7th Cir. 1975).

Retrocession of the jurisdiction of this state over crimes committed by Menominee Indians on the reservation was accomplished on March 1, 1976. Thereafter jurisdiction over crimes committed by Menominee Indians on the reservation vested in the federal and tribal governments. *Pyatskowit, supra,* at 280. The crimes charged here occurred on November 1, 1975; therefore the state courts had jurisdiction in this case.

Appellant next contends that the consecutive sentences imposed here constitute cruel and unusual punishment because they were imposed for what was essentially a single course of conduct.

Sec. 973.15, Stats., provides that a court may impose as many sentences as there are convictions, either concurrently or consecutively.

In *McCleary v. State,* 49 Wis.2d 263, 182 N.W.2d 512 (1971), this court established the following standards for reviewing a sentence:

". . . all an appellate court can ask of a trial judge is that he state the facts on which he predicates his judgment, and that he give the reasons for his conclusion. If the facts are fairly inferable from the record, and the reasons indicate the consideration of legally relevant factors, the sentence should ordinarily be affirmed. If there is evidence that discretion was properly exercised, and the sentence imposed was the product of that discretion, the trial judge fully complies with the standard." *Id.* at 281.

The appellant concedes that the trial judge complied with these standards.

The decision whether consecutive sentences are necessary is one within the trial court's discretion, considering the gravity of the offense, the character of the offender and the need for protection of the public. *Cunningham v. State,* 76 Wis.2d 277, 281, 284, 251 N.W.2d 65 (1977). The statement of the trial judge at the time of the imposition of the sentences reflects that all relevant factors were considered and the trial judge properly exercised judicial discretion when imposing sentences.

In *Cunningham, supra,* this court again refused to adopt the limitation on consecutive sentences proposed in sec. 3.4 of the *ABA Standards Relating to Sentencing Alternatives and Procedures.*[1] *Cunningham, supra,* at

[1] **"3.4 Multiple offenses: same state; concurrent and consecutive terms.**

"*(a) After convictions of multiple offenses which are separately punishable or in cases where the defendant is serving a prison*

285, also held that any such change in the sentencing procedure should properly be addressed to the legislature.

In *Ruff v. State,* 65 Wis.2d 713, 223 N.W.2d 446 (1974), this court noted that a comment to sec. 3.4 referred to a "single criminal episode" as one in which the defendant is charged with multiple crimes for just one act and not in a case such as this where separate criminal acts occurred over an extended period of time.

sentence at the time of conviction, the question of whether to impose concurrent or consecutive sentences should be a matter for the discretion of the sentencing court.

"(b) Consecutive sentences are rarely appropriate. Authority to impose a consecutive sentence should be circumscribed by the following statutory limitations:

"(i) The aggregate maximum of consecutive terms should not be permitted to exceed the term authorized for an habitual offender . . . for the most serious of the offenses involved. If there is no provision for an habitual offender for the offenses involved, there should be a ceiling on the aggregate of consecutive terms which is related to the severity of the offenses involved; and

"(ii) The aggregate minimum of consecutive terms should be governed by the limitations stated in section 3.2; and

"(iii) The court should not be authorized to impose a consecutive sentence until a presentence report (sections 4.1–4.5), supplemented by a report of the examination of the defendant's mental, emotional and physical condition (section 4.6), has been obtained and considered; and

"(iv) Imposition of a consecutive sentence should require the affirmative action of the sentencing court. The court should be authorized to impose a consecutive sentence only after a finding that confinement for such a term is necessary in order to protect the public from further criminal conduct by the defendant.

These limitations should also apply to any sentence for an offense committed prior to the imposition of sentence for another offense, whether the previous sentence for the other offense has been served or remains to be served.

"(c) Corrections and parole authorities should be directed to consider an offender committed under multiple sentences as though he had been committed for a single term the limits of which were defined by the cumulative effect of the multiple sentences."

Appellant's acts toward each victim here constituted separate acts of violence. The case is similar to *Tucker v. State*, 56 Wis.2d 728, 202 N.W.2d 897 (1973), in which the court approved consecutive sentences on six convictions of endangering safety for the defendant's conduct in shooting at several police officers. Separate acts were committed with respect to each victim. Consecutive sentences are appropriate here and do not constitute an abuse of discretion.

Finally, appellant contends that the failure of John Haack, one of the victims, to appear and testify at trial requires that the charge of endangering his safety be dismissed. Appellant does not similarly challenge the failure of the murder victim, Donald Bohardt, to appear and testify.

The sixth amendment guarantees a defendant the right to cross-examine the witnesses against him. John Haack was not a witness. His version of the events of November 1, 1975, was not presented at trial. Haack was subpoenaed but did not appear at trial.

In *Gaertner v. State*, 35 Wis.2d 159, 150 N.W.2d 370 (1967), the court said:

". . . the right of confrontation does not require the state to produce any particular witness or give the accused the right to insist that the state call any particular witness. . . . Not even the victim, or the accuser in the sense of the person swearing to the complaint which becomes the basis for the arrest, need be called as a witness. . . . The constitutionally guaranteed right of confrontation applies in relation to the giving of testimony which is considered by the trier of the fact on the issue of the accused's guilt. Complaining witnesses or an informer or a decoy are not witnesses within such constitutional requirement when they neither become witnesses in person at the trial nor otherwise

give testimony to be used on the issue of guilt. . . ." *Id.* at 166.

Appellant's sixth-amendment rights were not violated by Haack's failure to appear and testify.

*By the Court.*—Judgment and order affirmed.