MARTIN, Plaintiff in error, v. STATE, Defendant in error.

Supreme Court

*No. 76–515–CR. Submitted on briefs January 9, 1979.—*
*Decided January 30, 1979.*
(Also reported in 274 N.W.2d 609.)

For the plaintiff in error the cause was submitted on the brief of *Gerald P. Boyle* of Milwaukee.

For the defendant in error the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *Marguerite M. Moeller,* assistant attorney general.

BEILFUSS, C.J.    The defendant raises three issues: (1) Whether the evidence was sufficient to sustain a conviction of first-degree murder; (2) whether it was error to admit an oral statement given by the defendant to a police officer and (3) whether a new trial should be granted in the interest of justice.

This tragic and completely unnecessary event was the culmination of the foolish anger engendered by the senseless discourtesy of two automobile drivers.

The dispositive legal issue of this appeal is whether there is sufficient credible evidence the jury could accept as true to support and validate its verdict of first-degree murder.  We believe there is and affirm the trial court's order.

On the afternoon of August 1, 1975, defendant Kenneth Martin left his place of employment in Milwaukee and headed north on U. S. 141 toward his home, Sheboygan. On the same afternoon Mr. and Mrs. Joseph Nellis with their grandson Frank Turk and the family dog left their home in Milwaukee and drove north on the same expressway to spend the weekend, as was their habit, at their cottage in Door County.  The paths of the two vehicles crossed at a construction area in the vicinity of U. S. 141 north and the Arrowhead Road overpass in Ozaukee County.  The two cars approached the construction site where arrows marked the end of the left lane and signaled traffic to merge right.  Defendant's car, a silver gray Toyota Celica, was in the left lane; the Nellis' car, a gold Buick, was on the right.  Defendant Martin attempted to pull into the right lane in front of the Nellis car but Mr. Nellis accelerated forcing the Martin car to fall behind.  The fact that Mr. Nellis speeded up

and did not allow him to pass, by defendant's own admission, aggravated him. There is conflicting testimony about what occurred as the two cars proceeded through the construction area. Defendant Martin contended that Mr. Nellis alternately accelerated and braked the whole length of the construction area. Other testimony from an eyewitness indicated that defendant Martin followed the Nellis car very closely and tried unsuccessfully several times to pass.

Beyond the construction area the road became a four-lane highway. Both cars accelerated very rapidly. The defendant continued to follow the Nellis car closely for a distance of about 30 miles. The defendant testified that he pursued the vehicle to obtain the license number in order to report Mr. Nellis to the police. As the two vehicles approached the turn-off for Highway 42, the defendant Martin passed Nellis on the left, cut sharply back in front of him, and sped down the exit ramp. As he passed, the defendant threw something which "sounded like a handful of pebbles being thrown" at the Nellis car. The defendant claimed he threw a dime and possibly a matchbook because he thought Nellis' car had swerved toward his.

Nellis then abandoned the route to Door County and followed defendant's car down the exit ramp. Nellis' wife testified that Nellis had declared, "He threw stones at our car . . . I want to know why." Defendant Martin estimated his own speed to be 80 to 85 miles per hour at this time. Defendant's Toyota stopped quite abruptly at the stop sign which marked the intersection of Highway 42. Nellis' Buick stopped a short distance behind. Nellis got out of his car and walked rapidly toward the driver's side of defendant's vehicle. As Nellis approached, defendant Martin rolled his window up one crank and took his .357 magnum derringer out of his glove com-

partment because, in his words, "I was afraid that he was going to molest me in some way."

What took place as Nellis reached the Toyota happened very quickly and is subject to dispute. However, it is known that in a matter of seconds the defendant's gun had been fired once and Joseph Nellis was dead with a wound in his chest and left forearm. The defendant immediately fled the scene at a great speed, driving over one of the victim's ankles as he left. Martin testified he had no recollection at all of leaving the area.

At about 4:45 p.m., on the same day Martin walked hurriedly into the office of Captain Victor Keitel of the City of Sheboygan Police Department, immediately stated "I just shot a guy. Here's the gun," and placed the gun on the captain's desk. Captain Keitel was in fact already aware of the fact that a shooting incident involving a person of Martin's description had occurred at approximately 4:30 p.m., at the junction of the northbound off ramp of U. S. 141 and Highway 42 in the Township of Sheboygan, Sheboygan County. Defendant Martin remained in the captain's office until personnel from the County Sheriff's Department came to pick him up.

The defendant Martin was arrested and charged with first-degree murder. After a preliminary hearing he was ordered to stand trial. A plea of not guilty was entered.

Prior to trial the defendant made a motion to suppress any statements given by him to law enforcement personnel of the City and County of Sheboygan. Specifically, the defendant challenged the admissibility of his comments to Captain Keitel of the City of Sheboygan Police Department shortly after the shooting incident. These statements were made over the forty-five minute period during which the defendant was sitting in the captain's office awaiting the arrival of law enforcement personnel from the County Sheriff's Department.

The comments occurred before formal arrest and prior to the giving of *Miranda* warnings. Captain Keitel admitted that the defendant was not completely free to leave the premises at the time. It was undisputed, however, that the statements were spontaneously offered by Martin and were not made during an interrogation or in response to questioning. The defendant did not contest his second statement, more complete than but substantially consistent with the first, given about two hours later to Detective Hoffman after the required constitutional warnings had been recited and a written waiver had been read and signed by Martin. The motion to suppress was denied.

This court stated in *Hart v. State,* 75 Wis.2d 371, 396, 249 N.W.2d 810 (1977) :

"Before a jury verdict may be overturned on appeal for insufficiency of the evidence,
" '. . . the evidence when considered most favorably to the state and the conviction must be so insufficient in probative value and force that it can be said as a matter of law that no trier of the facts acting reasonably could be convinced to that degree of certitude which the law defines as "beyond a reasonable doubt." ' *Lock v. State,* 31 Wis.2d 110, 115, 142 N.W.2d 183 (1966)."

The defendant concedes that a conviction of some degree of homicide on the facts of the present case would be justifiable. However, he contends that the evidence is insufficient to establish an "intent" to kill and thus insufficient to sustain a verdict of murder in the first degree.

"Intent is by its very nature rarely susceptible to proof by direct evidence." *Clark v. State,* 62 Wis.2d 194, 197, 214 N.W.2d 450 (1974). However, it ". . . may reasonably be ascertained from the acts and conduct of a defendant, and the inferences fairly deducible from the

circumstances." *Jacobs v. State,* 50 Wis.2d 361, 366, 184 N.W.2d 113 (1971). The principle has been specifically applied in cases of first-degree murder with the result that intent to kill can be presumed where the defendant shoots the victim in a vital part.[1]

Joseph Nellis was fatally shot in the chest by a single bullet fired from defendants' pistol. The defendant admitted that he knew the gun was loaded when he removed it from the glove compartment. He was also aware of the fact that there was no longer any safety mechanism on the weapon. On cross-examination he acknowledged that there had been enough time while Nellis was approaching his car for him to close the window and lock the door.

Intent to kill can also be inferred from the physical evidence in this case. A firearms specialist from the State Crime Laboratory testified that based on the physical evidence and laboratory testing performed by him, he would estimate the muzzle to target distance to be greater than three feet and less than seven feet. The state's pathologist, Dr. Andrew Cyrus, Sheboygan County Coroner, testified that the distance determination tests he carried out in connection with the autopsy suggested that the distance from the muzzle of the weapon to the forearm wound was from eighteen to twenty-four inches. Dr. Cyrus further testified that a diagram of the missile path revealed that the source of the missile was directly lateral to the body, indicating that Nellis was not directly facing the defendant at the time the shooting occurred. Dr. Helen Young, a pathologist called by the defense, also testified that judging from the wound one could conclude that the body was in a slightly twisted position.

---

[1] *Lofton v. State,* 83 Wis.2d 472, 478, 266 N.W.2d 576 (1978); *Smith v. State,* 69 Wis.2d 297, 303, 230 N.W.2d 858 (1975); *Larson v. State,* 86 Wis.2d 187, 199, 271 N.W.2d 647 (1978).

The testimony of several eyewitnesses to the events could also have been relied on by the jury to support the inference of intent to kill. One witness who had followed the vehicles through the construction zone testified that at one point the defendant put his left arm out the window and shook a shiny object which protruded from his hand about two or three inches at the Nellis car. According to his testimony, the object was consistent in appearance with the defendant's derringer. The four eyewitnesses to the actual shooting all agreed that Nellis was standing at the side of the Martin car for only a matter of seconds before the gun was fired.

The defendant's testimony contradicted some of the state's evidence set forth above. His version of the events may be summarized as follows: He never intended to fire the weapon; he only took the gun out from under his leg (where he had temporarily placed it) because Nellis was choking him; after Nellis saw the gun, he (Nellis) started to back away and then suddenly lunged back toward the car; Nellis grabbed his (the defendant's) hands; in the struggle somehow the gun went off. One of the eyewitnesses testified that the two men appeared to be grappling with their hands for a couple of seconds prior to the shooting.

Credibility of the witnesses and the inferences to be drawn therefrom are within the province of the trier of fact.[2] In light of all the evidence received and testimony adduced at the trial regarding the circumstances of the shooting, the jury reasonably could and, as the verdict indicates, did reject the defendant's version of the incident.

Despite the substantial credible evidence and clearly established review standards, the defendant nonetheless

---

[2] *Gauthier v. State*, 28 Wis.2d 412, 416, 137 N.W.2d 101 (1965).

argues that the conviction of first-degree murder was fatally compromised because the jury must have relied to some extent on allegedly incredible evidence, *i.e.*, that the bullet entered at the victim's seventh rib, which evidence was presented by Dr. Cyrus in his testimony for the state. We do not accept this argument. First, although the conclusion was disputed by Dr. Young,[3] Dr. Cyrus' testimony was not fundamentally incredible.[4] Second, the fact that Dr. Cyrus may have been mistaken, if indeed he was, in fixing the point of entry at the seventh rib in no way negates the main thrust of Dr. Cyrus' testimony, namely, that the victim's body was turned somewhat to the right with his left arm and side facing the defendant at the moment of the shooting. Dr. Young's testimony corroborated Dr. Cyrus' conclusion in that particular regard. Third, the court properly instructed the jury on the weight to be given expert testimony and the way to resolve any conflict that may exist in the testimony of different expert witnesses.[5] Fourth, even with-

---

[3] On the basis of a photo of the body taken by Dr. Cyrus, Dr. Young placed the point of entry at the fifth and not the seventh rib. Dr. Young, however, had never actually seen the body and did not participate in the autopsy.

[4] ". . . incredible evidence is evidence in conflict with the uniform course of nature or with fully established or conceded facts." *State v. Oliver*, 84 Wis.2d 316, 324, 267 N.W.2d 333 (1978).

[5] ". . . A witness, however, who has special knowledge, experience, skill, training or education or particular profession or occupation is permitted to testify and is allowed to give his opinions as an expert in the field. In determining the weight to be given to the opinions of experts you should consider the qualifications and credibility of the expert, whether the opinions are based upon established facts or conceded facts in the case, and the reasons given for the opinions. Such evidence is competent and it is admitted for the purpose of aiding you in arriving at a conclusion if it does aid you. You are not bound by the opinions of any expert. You should consider all the evidence in the case and should carefully consider the opinion evidence with all the other evidence in the case, giving to it just such weight as you deem it is en-

out Dr. Cyrus' testimony regarding the point of entry of the bullet, there was ample credible evidence to support a finding the defendant intended to kill the victim and a conviction of first-degree murder beyond a reasonable doubt.

The trial court, in submitting the matter to the jury, instructed the jury on every other conceivable lesser included offense that would accommodate any theory or explanation given by the defendant or his witnesses. The jury, in the performance of its duty, rejected the lesser offenses as it was entitled to do under the law and the facts of this case.

This is not a case where the evidence considered most favorably to the conviction fails to satisfy the recognized standard on review. It cannot be said that no jury acting reasonably could be convinced of defendant's guilt beyond a reasonable doubt.

The second issue that the defendant raises concerns the oral statement made by the defendant to Captain Keitel of the Sheboygan Police Department shortly after the shooting. *Miranda* warnings had not been given at the time. Furthermore, the trial court found that the defendant was in custody despite the fact that he had not been formally arrested. It is undisputed that the statements were not made during interrogation or in response to questioning. It is the defendant's contention that the statements should have been suppressed for failure to comply with the *Miranda* rule.

The case is ruled by *Roney v. State,* 44 Wis.2d 522, 531–32, 171 N.W.2d 400 (1969), in which this court made the following declaration:

---

titled to receive. In resolving any conflict that may exist in the testimony of expert witnesses you should weigh the opinion of one expert against that of another. In doing this you should consider the relative qualifications and credibility of the expert witnesses as well as the reasons for each opinion and the facts and other matters upon which it was based."

"As it clearly stated in *Miranda,* however, custody alone does not invoke the *Miranda* rule. *Miranda* holds that a statement that is volunteered and not elicited as a result of prior interrogation is free from the strictures of *Miranda* even if made while in custody. The statement of the defendant herein was completely spontaneous and was not in response to any interrogation. . . ." *See also Priddy v. State,* 55 Wis.2d 312, 314, 198 N.W.2d 624 (1972).

The statements were not the results of a prior interrogation. The trial court's finding that the statements were spontaneously and voluntarily made is supported by the evidence. The motion to suppress was properly denied.

The defendant further argues that the statements, if admitted at all, should have been brought out by the defense rather than by the state, because there are few weapons in the defense arsenal in cases of this kind, and that they should be reserved for the defense. The argument has no support in our cases and is rejected. The state would have been remiss had it failed to put in the evidence.

Finally, the defendant maintains that a new trial should be granted in the interest of justice. In view of the conclusions above that the conviction is amply supported by the evidence and that the motion to suppress was properly denied, a new trial in the interest of justice would not be appropriate.

*By the Court.*—Order affirmed.